# BURDICK *v.* TAKUSHI, DIRECTOR OF ELECTIONS OF HAWAII, ET AL.

No. 91–535.   Argued March 24, 1992—Decided June 8, 1992

WHITE, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, SOUTER, and THOMAS, JJ., joined. KENNEDY, J., filed a dissenting opinion, in which BLACKMUN and STEVENS, JJ., joined, *post*, p. 442.

*Arthur N. Eisenberg* argued the cause for petitioner. With him on the briefs were *Steven R. Shapiro, John A. Powell, Mary Blaine Johnston, Carl Varady, Paul W. Kahn, Lawrence G. Sager, Burt Neuborne,* and *Alan B. Burdick, pro se.*

*Steven S. Michaels,* Deputy Attorney General of Hawaii, argued the cause for respondents. With him on the brief were *Warren Price III,* Attorney General, and *Girard D. Lau,* Deputy Attorney General.*

---

*Briefs of *amici curiae* urging reversal were filed for Common Cause/ Hawaii by *Stanley E. Levin;* for the Hawaii Libertarian Party by *Arlo Hale Smith;* and for the Socialist Workers Party by *Edward Copeland* and *Eric M. Lieberman.*

A brief of *amici curiae* urging affirmance was filed for the State of Arizona et al. by *Frankie Sue Del Papa,* Attorney General of Nevada, and *Kateri Cavin,* Deputy Attorney General, and by the Attorneys General for their respective jurisdictions as follows: *Grant Woods* of Arizona, *Robert A. Butterworth* of Florida, *Richard P. Ieyoub* of Louisiana, *Lacy H. Thornburg* of North Carolina, *Susan Brimer Loving* of Oklahoma, *Mark*

JUSTICE WHITE delivered the opinion of the Court.

The issue in this case is whether Hawaii's prohibition on write-in voting unreasonably infringes upon its citizens' rights under the First and Fourteenth Amendments. Petitioner contends that the Constitution requires Hawaii to provide for the casting, tabulation, and publication of write-in votes. The Court of Appeals for the Ninth Circuit disagreed, holding that the prohibition, taken as part of the State's comprehensive election scheme, does not impermissibly burden the right to vote. 937 F. 2d 415, 422 (1991). We affirm.

I

Petitioner is a registered voter in the city and county of Honolulu. In 1986, only one candidate filed nominating papers to run for the seat representing petitioner's district in the Hawaii House of Representatives. Petitioner wrote to state officials inquiring about Hawaii's write-in voting policy and received a copy of an opinion letter issued by the Hawaii Attorney General's Office stating that the State's election law made no provision for write-in voting. 1 App. 38–39, 49.

Petitioner then filed this lawsuit, claiming that he wished to vote in the primary and general elections for a person who had not filed nominating papers and that he wished to vote in future elections for other persons whose names might not appear on the ballot. Id., at 32–33. The United States District Court for the District of Hawaii concluded that the ban on write-in voting violated petitioner's First Amendment right of expression and association and entered a preliminary injunction ordering respondents to provide for the casting and tallying of write-in votes in the November 1986 general

Barnett of South Dakota, Paul Van Dam of Utah, Joseph B. Meyer of Wyoming, and Robert Naraja of the Commonwealth of the Northern Mariana Islands.

James C. Linger filed a brief for Andre Marrou et al. as amici curiae.

election. App. to Pet. for Cert. 67a–77a. The District Court denied a stay pending appeal. 1 App. 76–107.

The Court of Appeals entered the stay, *id.*, at 109, and vacated the judgment of the District Court, reasoning that consideration of the federal constitutional question raised by petitioner was premature because "neither the plain language of Hawaii statutes nor any definitive judicial interpretation of those statutes establishes that the Hawaii legislature has enacted a ban on write-in voting," *Burdick* v. *Takushi*, 846 F. 2d 587, 588 (CA9 1988). Accordingly, the Court of Appeals ordered the District Court to abstain, see *Railroad Comm'n of Texas* v. *Pullman Co.*, 312 U. S. 496 (1941), until state courts had determined whether Hawaii's election laws permitted write-in voting.[1]

On remand, the District Court certified the following three questions to the Supreme Court of Hawaii:

> "(1) Does the Constitution of the State of Hawaii require Hawaii's election officials to permit the casting of write-in votes and require Hawaii's election officials to count and publish write-in votes?
>
> "(2) Do Hawaii's election laws require Hawaii's election officials to permit the casting of write-in votes and require Hawaii's election officials to count and publish write-in votes?
>
> "(3) Do Hawaii's election laws permit, but not require, Hawaii's election officials to allow voters to cast write-in votes and to count and publish write-in votes?" App. to Pet. for Cert. 56a–57a.

---

[1] While petitioner's appeal was pending, he became concerned that the Court of Appeals might not enter its decision before the September 1988 primary election. Accordingly, petitioner filed a second suit challenging the unavailability of write-in voting in the 1988 election. *Burdick* v. *Cayetano*, Civ. No. 99–0365. Coincidentally, petitioner's new suit was filed on the very day that the Ninth Circuit decided the appeal stemming from petitioner's original complaint. The two actions subsequently were consolidated by the District Court. 1 App. 142.

Hawaii's high court answered "No" to all three questions, holding that Hawaii's election laws barred write-in voting and that these measures were consistent with the State's Constitution. *Burdick* v. *Takushi*, 70 Haw. 498, 776 P. 2d 824 (1989). The United States District Court then granted petitioner's renewed motion for summary judgment and injunctive relief, but entered a stay pending appeal. 737 F. Supp. 582 (Haw. 1990).

The Court of Appeals again reversed, holding that Hawaii was not required to provide for write-in votes:

> "Although the prohibition on write-in voting places some restrictions on [petitioner's] rights of expression and association, that burden is justified in light of the ease of access to Hawaii's ballots, the alternatives available to [petitioner] for expressing his political beliefs, the State's broad powers to regulate elections, and the specific interests advanced by the State." 937 F. 2d, at 421.[2]

In so ruling, the Ninth Circuit expressly declined to follow an earlier decision regarding write-in voting by the Court of Appeals for the Fourth Circuit. See *ibid.*, citing *Dixon* v. *Maryland State Administrative Bd. of Election Laws,* 878 F. 2d 776 (CA4 1989). We granted certiorari to resolve the disagreement on this important question. 502 U. S. 1003 (1991).

## II

Petitioner proceeds from the erroneous assumption that a law that imposes any burden upon the right to vote must be subject to strict scrutiny. Our cases do not so hold.

---

[2] The Ninth Circuit panel issued its opinion on March 1, 1991. See *Burdick* v. *Takushi,* 927 F. 2d 469. On June 28, 1991, the Court of Appeals denied petitioner's petition for rehearing and suggestion for rehearing en banc, and the panel withdrew its original opinion and issued the version that appears at 937 F. 2d 415.

It is beyond cavil that "voting is of the most fundamental significance under our constitutional structure." *Illinois Bd. of Elections* v. *Socialist Workers Party,* 440 U. S. 173, 184 (1979). It does not follow, however, that the right to vote in any manner and the right to associate for political purposes through the ballot are absolute. *Munro* v. *Socialist Workers Party,* 479 U. S. 189, 193 (1986). The Constitution provides that States may prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives," Art. I, §4, cl. 1, and the Court therefore has recognized that States retain the power to regulate their own elections. *Sugarman* v. *Dougall,* 413 U. S. 634, 647 (1973); *Tashjian* v. *Republican Party of Connecticut,* 479 U. S. 208, 217 (1986). Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer* v. *Brown,* 415 U. S. 724, 730 (1974).

Election laws will invariably impose some burden upon individual voters. Each provision of a code, "whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends." *Anderson* v. *Celebrezze,* 460 U. S. 780, 788 (1983). Consequently, to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest, as petitioner suggests, would tie the hands of States seeking to assure that elections are operated equitably and efficiently. See Brief for Petitioner 32–37. Accordingly, the mere fact that a State's system "creates barriers . . . tending to limit the field of candidates from which voters might choose . . . does not of itself compel close scrutiny." *Bullock* v. *Carter,* 405

U. S. 134, 143 (1972); *Anderson, supra,* at 788; *McDonald* v. *Board of Election Comm'rs of Chicago,* 394 U. S. 802 (1969).

Instead, as the full Court agreed in *Anderson,* 460 U. S., at 788–789; *id.,* at 808, 817 (REHNQUIST, J., dissenting), a more flexible standard applies. A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.,* at 789; *Tashjian, supra,* at 213–214.

Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." *Norman* v. *Reed,* 502 U. S. 279, 289 (1992). But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions. *Anderson,* 460 U. S., at 788; see also *id.,* at 788–789, n. 9. We apply this standard in considering petitioner's challenge to Hawaii's ban on write-in ballots.

A

There is no doubt that the Hawaii election laws, like all election regulations, have an impact on the right to vote, *id.,* at 788, but it can hardly be said that the laws at issue here unconstitutionally limit access to the ballot by party or independent candidates or unreasonably interfere with the right of voters to associate and have candidates of their choice placed on the ballot. Indeed, petitioner understandably does

not challenge the manner in which the State regulates candidate access to the ballot.

To obtain a position on the November general election ballot, a candidate must participate in Hawaii's open primary, "in which all registered voters may choose in which party primary to vote." *Tashjian, supra,* at 223, n. 11. See Haw. Rev. Stat. § 12–31 (1985). The State provides three mechanisms through which a voter's candidate-of-choice may appear on the primary ballot.

First, a party petition may be filed 150 days before the primary by any group of persons who obtain the signatures of one percent of the State's registered voters.[3] Haw. Rev. Stat. § 11–62 (Supp. 1991). Then, 60 days before the primary, candidates must file nominating papers certifying, among other things, that they will qualify for the office sought and that they are members of the party that they seek to represent in the general election. The nominating papers must contain the signatures of a specified number of registered voters: 25 for candidates for statewide or federal office; 15 for state legislative and county races. Haw. Rev. Stat. §§ 12–2.5 to 12–7 (1985 and Supp. 1991). The winner in each party advances to the general election. Thus, if a party forms around the candidacy of a single individual and no one else runs on that party ticket, the individual will be elected at the primary and win a place on the November general election ballot.

The second method through which candidates may appear on the Hawaii primary ballot is the established party route.[4]

---

[3] We have previously upheld party and candidate petition signature requirements that were as burdensome or more burdensome than Hawaii's one-percent requirement. See, *e. g., Norman* v. *Reed,* 502 U. S. 279, 295 (1992); *American Party of Texas* v. *White,* 415 U. S. 767 (1974); *Jenness* v. *Fortson,* 403 U. S. 431 (1971).

[4] In *Jenness,* we rejected an equal protection challenge to a system that provided alternative means of ballot access for members of established political parties and other candidates, concluding that the system was con-

Established parties that have qualified by petition for three consecutive elections and received a specified percentage of the vote in the preceding election may avoid filing party petitions for 10 years. Haw. Rev. Stat. § 11–61 (1985). The Democratic, Republican, and Libertarian Parties currently meet Hawaii's criteria for established parties. Like new party candidates, established party contenders are required to file nominating papers 60 days before the primary. Haw. Rev. Stat. §§ 12–2.5 to 12–7 (1985 and Supp. 1991).[5]

The third mechanism by which a candidate may appear on the ballot is through the designated nonpartisan ballot. Nonpartisans may be placed on the nonpartisan primary ballot simply by filing nominating papers containing 15 to 25 signatures, depending upon the office sought, 60 days before the primary. §§ 12–3 to 12–7. To advance to the general election, a nonpartisan must receive 10 percent of the primary vote or the number of votes that was sufficient to nominate a partisan candidate, whichever number is lower. *Hustace* v. *Doi*, 60 Haw. 282, 289–290, 588 P. 2d 915, 920 (1978). During the 10 years preceding the filing of this action, 8 of 26 nonpartisans who entered the primary obtained slots on the November ballot. Brief for Respondents 8.

Although Hawaii makes no provision for write-in voting in its primary or general elections, the system outlined above provides for easy access to the ballot until the cutoff date for the filing of nominating petitions, two months before the primary. Consequently, any burden on voters' freedom of choice and association is borne only by those who fail to iden-

---

stitutional because it did not operate to freeze the political status quo. 403 U. S., at 438.

[5] In *Anderson* v. *Celebrezze*, 460 U. S. 780 (1983), the Court concluded that Ohio's early filing deadline for Presidential candidates imposed an unconstitutional burden on voters' freedom of choice and freedom of association. But *Anderson* is distinguishable because the Ohio election scheme, as explained by the Court, provided no means for a candidate to appear on the ballot after a March cutoff date. *Id.*, at 786. Hawaii fills this void through its nonpartisan primary ballot mechanism.

tify their candidate of choice until days before the primary. But in *Storer* v. *Brown,* we gave little weight to "the interest the candidate and his supporters may have in making a late rather than an early decision to seek independent ballot status." 415 U. S., at 736.[6] Cf. *Rosario* v. *Rockefeller,* 410 U. S. 752, 757 (1973). We think the same reasoning applies here and therefore conclude that any burden imposed by Hawaii's write-in vote prohibition is a very limited one. "To conclude otherwise might sacrifice the political stability of the system of the State, with profound consequences for the entire citizenry, merely in the interest of particular candidates and their supporters having instantaneous access to the ballot." *Storer, supra,* at 736.[7]

Because he has characterized this as a voting rights rather than ballot access case, petitioner submits that the write-in prohibition deprives him of the opportunity to cast a meaningful ballot, conditions his electoral participation upon the

---

[6] In *Storer,* we upheld a California ballot access law that refused to recognize independent candidates until a year after they had disaffiliated from a political party.

[7] The dissent complains that, because primary voters are required to opt for a specific partisan or nonpartisan ballot, they are foreclosed from voting in those races in which no candidate appears on their chosen ballot and in those races in which they are dissatisfied with the available choices. *Post,* at 444. But this is generally true of primaries; voters are required to select a ticket, rather than choose from the universe of candidates running on all party slates. Indeed, the Court has upheld the much more onerous requirement that voters interested in participating in a primary election enroll as a member of a political party prior to the preceding general election. *Rosario* v. *Rockefeller,* 410 U. S. 752 (1973). Cf. *American Party of Texas, supra,* at 786 ("[T]he State may determine that it is essential to the integrity of the nominating [petition] process to confine voters to supporting one party and its candidates in the course of the same nominating process").

If the dissent were correct in suggesting that requiring primary voters to select a specific ballot impermissibly burdened the right to vote, it is clear under our decisions that the availability of a write-in option would not provide an adequate remedy. *Anderson, supra,* at 799, n. 26; *Lubin* v. *Panish,* 415 U. S. 709, 719, n. 5 (1974).

waiver of his First Amendment right to remain free from espousing positions that he does not support, and discriminates against him based on the content of the message he seeks to convey through his vote. Brief for Petitioner 19. At bottom, he claims that he is entitled to cast and Hawaii required to count a "protest vote" for Donald Duck, Tr. of Oral Arg. 5, and that any impediment to this asserted "right" is unconstitutional.

Petitioner's argument is based on two flawed premises. First, in *Bullock* v. *Carter*, we minimized the extent to which voting rights cases are distinguishable from ballot access cases, stating that "the rights of voters and the rights of candidates do not lend themselves to neat separation." 405 U. S., at 143.[8] Second, the function of the election process is "to winnow out and finally reject all but the chosen candidates," *Storer*, 415 U. S., at 735, not to provide a means of giving vent to "short-range political goals, pique, or personal quarrel[s]." *Ibid.* Attributing to elections a more generalized expressive function would undermine the ability of States to operate elections fairly and efficiently. *Id.*, at 730.

Accordingly, we have repeatedly upheld reasonable, politically neutral regulations that have the effect of channeling expressive activity at the polls. See *Munro*, 479 U. S., at 199. Petitioner offers no persuasive reason to depart from these precedents. Reasonable regulation of elections *does not* require voters to espouse positions that they do not support; it *does* require them to act in a timely fashion if they wish to express their views in the voting booth. And there is nothing content based about a flat ban on all forms of write-in ballots.

The appropriate standard for evaluating a claim that a state law burdens the right to vote is set forth in *Anderson*. Applying that standard, we conclude that, in light of the adequate ballot access afforded under Hawaii's election code, the

---

[8] Indeed, voters, as well as candidates, have participated in the so-called ballot access cases. *E. g., Anderson, supra,* at 783.

State's ban on write-in voting imposes only a limited burden on voters' rights to make free choices and to associate politically through the vote.

## B

We turn next to the interests asserted by Hawaii to justify the burden imposed by its prohibition of write-in voting. Because we have already concluded that the burden is slight, the State need not establish a compelling interest to tip the constitutional scales in its direction. Here, the State's interests outweigh petitioner's limited interest in waiting until the eleventh hour to choose his preferred candidate.

Hawaii's interest in "avoid[ing] the possibility of unrestrained factionalism at the general election," *Munro, supra,* at 196, provides adequate justification for its ban on write-in voting in November. The primary election is "an integral part of the entire election process," *Storer,* 415 U. S., at 735, and the State is within its rights to reserve "[t]he general election ballot . . . for major struggles . . . [and] not a forum for continuing intraparty feuds." *Ibid.; Munro, supra,* at 196, 199. The prohibition on write-in voting is a legitimate means of averting divisive sore-loser candidacies. Hawaii further promotes the two-stage, primary-general election process of winnowing out candidates, see *Storer, supra,* at 735, by permitting the unopposed victors in certain primaries to be designated officeholders. See Haw. Rev. Stat. §§ 12–41, 12–42 (1985). This focuses the attention of voters upon contested races in the general election. This would not be possible, absent the write-in voting ban.

Hawaii also asserts that its ban on write-in voting at the primary stage is necessary to guard against "party raiding." *Tashjian,* 479 U. S., at 219. Party raiding is generally defined as "the organized switching of blocs of voters from one party to another in order to manipulate the outcome of the other party's primary election." *Anderson,* 460 U. S., at 789, n. 9. Petitioner suggests that, because Hawaii conducts an open primary, this is not a cognizable interest. We dis-

agree. While voters may vote on any ticket in Hawaii's primary, the State requires that party candidates be "member[s] of the party," Haw. Rev. Stat. § 12–3(a)(7) (1985), and prohibits candidates from filing "nomination papers both as a party candidate and as a nonpartisan candidate," § 12–3(c). Hawaii's system could easily be circumvented in a party primary election by mounting a write-in campaign for a person who had not filed in time or who had never intended to run for election. It could also be frustrated at the general election by permitting write-in votes for a loser in a party primary or for an independent who had failed to get sufficient votes to make the general election ballot. The State has a legitimate interest in preventing these sorts of maneuvers, and the write-in voting ban is a reasonable way of accomplishing this goal.[9]

We think these legitimate interests asserted by the State are sufficient to outweigh the limited burden that the write-in voting ban imposes upon Hawaii's voters.[10]

---

[9] The State also supports its ban on write-in voting as a means of enforcing nominating requirements, combating fraud, and "fostering informed and educated expressions of the popular will." *Anderson,* 460 U. S., at 796.

[10] Although the dissent purports to agree with the standard we apply in determining whether the right to vote has been restricted, *post,* at 445–446, and implies that it is analyzing the write-in ban under some minimal level of scrutiny, *post,* at 448, the dissent actually employs strict scrutiny. This is evident from its invocation of quite rigid narrow tailoring requirements. For instance, the dissent argues that the State could adopt a less drastic means of preventing sore-loser candidacies, *ibid.,* and that the State could screen out ineligible candidates through postelection disqualification rather than a write-in voting ban. *Post,* at 450.

It seems to us that limiting the choice of candidates to those who have complied with state election law requirements is the prototypical example of a regulation that, while it affects the right to vote, is eminently reasonable. *Anderson, supra,* at 788. The dissent's suggestion that voters are entitled to cast their ballots for unqualified candidates appears to be driven by the assumption that an election system that imposes any restraint on voter choice is unconstitutional. This is simply wrong. See *supra,* at 433–434.

## III

Indeed, the foregoing leads us to conclude that when a State's ballot access laws pass constitutional muster as imposing only reasonable burdens on First and Fourteenth Amendment rights—as do Hawaii's election laws—a prohibition on write-in voting will be presumptively valid, since any burden on the right to vote for the candidate of one's choice will be light and normally will be counterbalanced by the very state interests supporting the ballot access scheme.

In such situations, the objection to the specific ban on write-in voting amounts to nothing more than the insistence that the State record, count, and publish individual protests against the election system or the choices presented on the ballot through the efforts of those who actively participate in the system. There are other means available, however, to voice such generalized dissension from the electoral process; and we discern no adequate basis for our requiring the State to provide and to finance a place on the ballot for recording protests against its constitutionally valid election laws.[11]

"No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry* v. *Sanders*, 376 U. S. 1, 17 (1964). But the right to vote is the right to participate in an electoral process that is necessarily structured to maintain the integrity of the democratic system. *Anderson, supra,* at 788; *Storer,* 415 U. S., at 730. We think that Hawaii's prohibition on write-in voting, considered as part of an electoral scheme that provides constitutionally sufficient ballot access, does not impose an unconstitutional burden upon the First and Fourteenth Amendment rights of

---

[11] We of course in no way suggest that a State is not free to provide for write-in voting, as many States do; nor should this opinion be read to discourage such provisions.

the State's voters. Accordingly, the judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE KENNEDY, with whom JUSTICE BLACKMUN and JUSTICE STEVENS join, dissenting.

The question before us is whether Hawaii can enact a total ban on write-in voting. The majority holds that it can, finding that Hawaii's ballot access rules impose no serious limitations on the right to vote. Indeed, the majority in effect adopts a presumption that prohibitions on write-in voting are permissible if the State's ballot access laws meet constitutional standards. I dissent because I disagree with the presumption, as well as the majority's specific conclusion that Hawaii's ban on write-in voting is constitutional.

The record demonstrates the significant burden that Hawaii's write-in ban imposes on the right of voters such as petitioner to vote for the candidates of their choice. In the election that triggered this lawsuit, petitioner did not wish to vote for the one candidate who ran for state representative in his district. Because he could not write in the name of a candidate he preferred, he had no way to cast a meaningful vote. Petitioner's dilemma is a recurring, frequent phenomenon in Hawaii because of the State's ballot access rules and the circumstance that one party, the Democratic Party, is predominant. It is critical to understand that petitioner's case is not an isolated example of a restriction on the free choice of candidates. The very ballot access rules the Court cites as mitigating his injury in fact compound it system-wide.

Democratic candidates often run unopposed, especially in state legislative races. In the 1986 general election, 33 percent of the elections for state legislative offices involved single candidate races. Reply Brief for Petitioner 2–3, n. 2. The comparable figures for 1984 and 1982 were 39 percent and 37.5 percent. *Ibid.* Large numbers of voters cast

blank ballots in uncontested races, that is, they leave the ballots blank rather than vote for the single candidate listed. In 1990, 27 percent of voters who voted in other races did not cast votes in uncontested state Senate races. Brief for Common Cause/Hawaii as *Amicus Curiae* 15–16. Twenty-nine percent of voters did not cast votes in uncontested state House races. *Id.*, at 16. Even in contested races in 1990, 12 to 13 percent of voters cast blank ballots. *Id.*, at 16–17.

Given that so many Hawaii voters are dissatisfied with the choices available to them, it is hard to avoid the conclusion that at least some voters would cast write-in votes for other candidates if given this option. The write-in ban thus prevents these voters from participating in Hawaii elections in a meaningful manner.

This evidence also belies the majority's suggestion that Hawaii voters are presented with adequate electoral choices because Hawaii makes it easy to get on the official ballot. To the contrary, Hawaii's ballot access laws taken as a whole impose a significant impediment to third-party or independent candidacies. The majority suggests that it is easy for new parties to petition for a place on the primary ballot because they must obtain the signatures of only one percent of the State's registered voters. This ignores the difficulty presented by the early deadline for gathering these signatures: 150 days (5 months) before the primary election. Meeting this deadline requires considerable organization at an early stage in the election, a condition difficult for many small parties to meet. See Brief for Socialist Workers Party as *Amicus Curiae* 10–11, n. 4.

If the party petition is unsuccessful or not completed in time, or if a candidate does not wish to be affiliated with a party, he may run as an independent. While the requirements to get on the nonpartisan ballot are not onerous (15 to 25 signatures, 60 days before the primary), the nonpartisan ballot presents voters with a difficult choice. This is because each primary voter can choose only a single ballot

for all offices. Hence, a voter who wishes to vote for an independent candidate for one office must forgo the opportunity to vote in an established party primary in every other race. Since there might be no independent candidates for most of the other offices, in practical terms the voter who wants to vote for one independent candidate forfeits the right to participate in the selection of candidates for all other offices. This rule, the very ballot access rule that the Court finds to be curative, in fact presents a substantial disincentive for voters to select the nonpartisan ballot. A voter who wishes to vote for a third-party candidate for only one particular office faces a similar disincentive to select the third party's ballot.

The dominance of the Democratic Party magnifies the disincentive because the primary election is dispositive in so many races. In effect, a Hawaii voter who wishes to vote for any independent candidate must choose between doing so and participating in what will be the dispositive election for many offices. This dilemma imposes a substantial burden on voter choice. It explains also why so few independent candidates secure enough primary votes to advance to the general election. As the majority notes, only eight independent candidates have succeeded in advancing to the general election in the past 10 years. That is, less than one independent candidate per year on average has in fact run in a general election in Hawaii.

The majority's approval of Hawaii's ban is ironic at a time when the new democracies in foreign countries strive to emerge from an era of sham elections in which the name of the ruling party candidate was the only one on the ballot. Hawaii does not impose as severe a restriction on the right to vote, but it imposes a restriction that has a haunting similarity in its tendency to exact severe penalties for one who does anything but vote the dominant party ballot.

Aside from constraints related to ballot access restrictions, the write-in ban limits voter choice in another way. Write-

in voting can serve as an important safety mechanism in those instances where a late-developing issue arises or where new information is disclosed about a candidate late in the race. In these situations, voters may become disenchanted with the available candidates when it is too late for other candidates to come forward and qualify for the ballot. The prohibition on write-in voting imposes a significant burden on voters, forcing them either to vote for a candidate whom they no longer support or to cast a blank ballot. Write-in voting provides a way out of the quandary, allowing voters to switch their support to candidates who are not on the official ballot. Even if there are other mechanisms to address the problem of late-breaking election developments (unsuitable candidates who win an election can be recalled), allowing write-in voting is the only way to preserve the voters' right to cast a meaningful vote in the general election.

With this background, I turn to the legal principles that control this case. At the outset, I agree with the first premise in the majority's legal analysis. The right at stake here is the right to cast a meaningful vote for the candidate of one's choice. Petitioner's right to freedom of expression is not implicated. His argument that the First Amendment confers upon citizens the right to cast a protest vote and to have government officials count and report this vote is not persuasive. As the majority points out, the purpose of casting, counting, and recording votes is to elect public officials, not to serve as a general forum for political expression.

I agree as well with the careful statement the Court gives of the test to be applied in this case to determine if the right to vote has been constricted. As the Court phrases it, we must "weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it neces-

sary to burden the plaintiff's rights.'" *Ante*, at 434, quoting *Tashjian* v. *Republican Party of Connecticut*, 479 U. S. 208, 213–214 (1986). I submit the conclusion must be that the write-in ban deprives some voters of any substantial voice in selecting candidates for the entire range of offices at issue in a particular election.

As a starting point, it is useful to remember that until the late 1800's, all ballots cast in this country were write-in ballots. The system of state-prepared ballots, also known as the Australian ballot system, was introduced in this country in 1888. See L. E. Fredman, The Australian Ballot: The Story of an American Reform ix (1968). Prior to this, voters prepared their own ballots or used preprinted tickets offered by political parties. Since there were no state-imposed restrictions on whose name could appear on a ballot, individuals could always vote for the candidates of their choice.

State-prepared ballots were considered to be a progressive reform to reduce fraudulent election practices. The preprinted ballots offered by political parties had often been in distinctive colors so that the party could determine whether one who had sold his vote had used the right ballot. *Id.*, at 22. The disadvantage of the new ballot system was that it could operate to constrict voter choice. In recognition of this problem, several early state courts recognized a right to cast write-in votes. See, *e. g.*, *Sanner* v. *Patton*, 155 Ill. 553, 562–564, 40 N. E. 290, 292–293 (1895) ("[I]f the construction contended for by appellee [prohibiting write-in voting] be the correct one, the voter is deprived of the constitutional right of suffrage; he is deprived of the right of exercising his own choice; and where this right is taken away there is nothing left worthy of the name of the right of suffrage—the boasted free ballot becomes a delusion"); *Patterson* v. *Hanley*, 136 Cal. 265, 270, 68 P. 821, 823 (1902) ("Under every form of ballot of which we have had any experience the voter has been allowed—and it seems to be agreed that he must be allowed—the privilege of casting his vote for any person for

any office by writing his name in the proper place"); and *Oughton* v. *Black*, 212 Pa. 1, 6–7, 61 A. 346, 348 (1905) ("Unless there was such provision to enable the voter, not satisfied to vote any ticket on the ballot, or for any names appearing on it, to make up an entire ticket of his own choice, the election as to him would not be equal, for he would not be able to express his own individual will in his own way").

As these courts recognized, some voters cannot vote for the candidate of their choice without a write-in option. In effect, a write-in ban, in conjunction with other restrictions, can deprive the voter of the opportunity to cast a meaningful ballot. As a consequence, write-in prohibitions can impose a significant burden on voting rights. See *Reynolds* v. *Sims*, 377 U. S. 533, 555 (1964) ("The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government"). For those who are affected by write-in bans, the infringement on their right to vote for the candidate of their choice is total. The fact that write-in candidates are longshots more often than not makes no difference; the right to vote for one's preferred candidate exists regardless of the likelihood that the candidate will be successful. *Socialist Labor Party* v. *Rhodes*, 290 F. Supp. 983, 987 (SD Ohio) ("A write-in ballot permits a voter to effectively exercise his individual constitutionally protected franchise. The use of write-in ballots does not and should not be dependent on the candidate's chance of success"), aff'd in part, modified in part *sub nom. Williams* v. *Rhodes*, 393 U. S. 23 (1968).

Based on the foregoing reasoning, I cannot accept the majority's presumption that write-in bans are permissible if the State's ballot access laws are otherwise constitutional. The presumption is circular, for it fails to take into account that we must consider the availability of write-in voting, or the lack thereof, as a factor in determining whether a State's ballot access laws considered as a whole are constitutional.

*Jenness* v. *Fortson*, 403 U. S. 431, 438 (1971); *Storer* v. *Brown*, 415 U. S. 724, 736, n. 7 (1974). The effect of the presumption, moreover, is to excuse a State from having to justify or defend any write-in ban. Under the majority's view, a write-in ban only has constitutional implications when the State's ballot access scheme is defective and write-in voting would remedy the defect. This means that the State needs to defend only its ballot access laws, and not the write-in restriction itself.

The majority's analysis ignores the inevitable and significant burden a write-in ban imposes upon some individual voters by preventing them from exercising their right to vote in a meaningful manner. The liberality of a State's ballot access laws is one determinant of the extent of the burden imposed by the write-in ban; it is not, though, an automatic excuse for forbidding all write-in voting. In my view, a State that bans write-in voting in some or all elections must justify the burden on individual voters by putting forth the precise interests that are served by the ban. A write-in prohibition should not be presumed valid in the absence of any proffered justification by the State. The standard the Court derives from *Anderson* v. *Celebrezze*, 460 U. S. 780 (1983), means at least this.

Because Hawaii's write-in ban, when considered in conjunction with the State's ballot access laws, imposes a significant burden on voters such as petitioner, it must put forward the state interests which justify the burden so that we can assess them. I do not think it necessary here to specify the level of scrutiny that should then be applied because, in my view, the State has failed to justify the write-in ban under any level of scrutiny. The interests proffered by the State, some of which are puzzling, are not advanced to any significant degree by the write-in prohibition. I consider each of the interests in turn.

The interest that has the best potential for acceptance, in my view, is that of preserving the integrity of party pri-

maries by preventing sore loser candidacies during the general election. As the majority points out, we have acknowledged the State's interest in avoiding party factionalism. A write-in ban does serve this interest to some degree by eliminating one mechanism which could be used by sore loser candidates. But I do not agree that this interest provides "adequate justification" for the ban. *Ante*, at 439. As an initial matter, the interest can at best justify the write-in prohibition for general elections; it cannot justify Hawaii's complete ban in both the primary and the general election. And with respect to general elections, a write-in ban is a very overinclusive means of addressing the problem; it bars legitimate candidacies as well as undesirable sore loser candidacies. If the State desires to prevent sore loser candidacies, it can implement a narrow provision aimed at that particular problem.

The second interest advanced by the State is enforcing its policy of permitting the unopposed victors in certain primaries to be designated as officeholders without having to go through the general election. The majority states that "[t]his would not be possible, absent the write-in voting ban." *Ibid.* This makes no sense. As petitioner's counsel acknowledged during oral argument, "[t]o the degree that Hawaii has abolished general elections in these circumstances, there is no occasion to cast a write-in ballot." Tr. of Oral Arg. 14. If anything, the argument cuts the other way because this provision makes it all the more important to allow write-in voting in the primary elections because primaries are often dispositive.

Hawaii justifies its write-in ban in primary elections as a way to prevent party raiding. Petitioner argues that this alleged interest is suspect because the State created the party raiding problem in the first place by allowing open primaries. I agree. It is ironic for the State to raise this concern when the risk of party raiding is a feature of the open primary system the State has chosen. The majority

suggests that write-in voting presents a particular risk of circumventing the primary system because state law requires candidates in party primaries to be members of the party. Again, the majority's argument is not persuasive. If write-in voters mount a campaign for a candidate who does not meet state-law requirements, the candidate would be disqualified from the election.

The State also cites its interest in promoting the informed selection of candidates, an interest it claims is advanced by "flushing candidates into the open a reasonable time before the election." Brief for Respondents 44. I think the State has it backwards. The fact that write-in candidates often do not conduct visible campaigns seems to me to make it more likely that voters who go to the trouble of seeking out these candidates and writing in their names are well informed. The state interest may well cut the other way.

The State cites interests in combating fraud and enforcing nomination requirements. But the State does not explain how write-in voting presents a risk of fraud in today's polling places. As to the State's interest in making sure that ineligible candidates are not elected, petitioner's counsel pointed out at argument that approximately 20 States require write-in candidates to file a declaration of candidacy and verify that they are eligible to hold office a few days before the election. Tr. of Oral Arg. 13.

In sum, the State's proffered justifications for the write-in prohibition are not sufficient under any standard to justify the significant impairment of the constitutional rights of voters such as petitioner. I would grant him relief.