Justice Scalia, with whom Justice Thomas and Justice Alito join,
concurring in the judgment.
The lead opinion assumes petitioners’ premise that the voter-identification law “may have imposed a special burden on” some voters, ante, at 199, but holds that petitioners have not assembled evidence to show that the special burden is severe enough to warrant strict scrutiny, ante, at 202-203. That is true enough, but for the sake of clarity and finality (as well as adherence to precedent), I prefer to decide these cases on the grounds that petitioners’ premise is irrelevant and that the burden at issue is minimal and justified.
To evaluate a law respecting the right to vote — whether it governs voter qualifications, candidate selection, or the voting process — we use the approach set out in Burdick v. Takushi, 504 U. S. 428 (1992). This calls for application of a deferential “important regulatory interests” standard for nonsevere, nondiscriminatory restrictions, reserving strict scrutiny for laws that severely restrict the right to vote. Id., at 433-434 (internal quotation marks omitted). The lead opinion resists the import of Burdick by characterizing it as simply adopting “the balancing approach” of Anderson v. Celebrezze, 460 U. S. 780 (1983) (majority opinion of Stevens, J.). See ante, at 190; see also ibid., n. 8. Although *205 Burdick liberally quoted Anderson, Burdick forged Anderson’s amorphous “flexible standard” into something resembling an administrable rule. See Burdick, swpra, at 434. Since Burdick, we have repeatedly reaffirmed the primacy of its two-track approach. See Timmons v. Twin Cities Area New Party, 520 U. S. 351, 358 (1997); Clingman v. Beaver, 544 U. S. 581, 586-587 (2005). “[S]trict scrutiny is appropriate only if the burden is severe.” Id., at 592. Thus, the first step is to decide whether a challenged law severely burdens the right to vote. Ordinary and widespread burdens, such as those requiring “nominal effort” of everyone, are not severe. See id., at 591, 593-597. Burdens are severe if they go beyond the merely inconvenient. See Storer v. Brown, 415 U. S. 724, 728-729 (1974) (characterizing the law in Williams v. Rhodes, 393 U. S. 23 (1968), as “severe” because it was “so burdensome” as to be “ ‘virtually impossible’ ” to satisfy).
Of course, we have to identify a burden before we can weigh it. The Indiana law affects different voters differently, ante, at 198-199, but what petitioners view as the law’s several light and heavy burdens are no more than the different impacts of the single burden that the law uniformly imposes on all voters. To vote in person in Indiana, everyone must have and present a photo identification that can be obtained for free. The State draws no classifications, let alone discriminatory ones, except to establish optional absentee and provisional balloting for certain poor, elderly, and institutionalized voters and for religious objectors. Nor are voters who already have photo identifications exempted from the burden, since those voters must maintain the accuracy of the information displayed on the identifications, renew them before they expire, and replace them if they are lost.
The Indiana photo-identification law is a generally applicable, nondiscriminatory voting regulation, and our precedents refute the view that individual impacts are relevant to determining the severity of the burden it imposes. In the course of concluding that the Hawaii laws at issue in Burdick “im *206 pose[d] only a limited burden on voters’ rights to make free choices and to associate politically through the vote,” 504 U. S., at 439, we considered the laws and their reasonably foreseeable effect on voters generally. See id., at 436-437. We did not discuss whether the laws had a severe effect on Mr. Burdick’s own right to vote, given his particular circumstances. That was essentially the approach of the Burdick dissenters, who would have applied strict scrutiny to the laws because of their effect on “some voters.” See id., at 446 (opinion of Kennedy, J.); see also id., at 448 (“The majority’s analysis ignores the inevitable and significant burden a write-in ban imposes upon some individual voters . . . ” (emphasis added)). Subsequent cases have followed Bur-dick’s generalized review of nondiscriminatory election laws. See, e. g., Timmons, supra, at 361-362; Clingman, 544 U. S., at 590-591 (plurality opinion); id., at 592-593 (opinion of the Court). Indeed, Clingman’s holding that burdens are not severe if they are ordinary and widespread would be rendered meaningless if a single plaintiff could claim a severe burden.
Not all of our decisions predating Burdick addressed whether a challenged voting regulation severely burdened the right to vote, but when we began to grapple with the magnitude of burdens, we did so categorically and did not consider the peculiar circumstances of individual voters or candidates. See, e. g., Jenness v. Fortson, 403 U. S. 431, 438-441 (1971). Thus, in Rosario v. Rockefeller, 410 U. S. 752 (1973), we did not link the State’s interest in inhibiting party raiding with the petitioners’ own circumstances. See id., at 760-762. And in Storer v. Brown, supra, we observed that the severity of the burden of a regulation should be measured according to its “nature, extent, and likely impact.” Id., at 738 (emphasis added). We therefore instructed the District Court to decide on remand whether “a reasonably diligent independent candidate [could] be expected to satisfy the signature requirements, or will it be *207 only rarely that the unaffiliated candidate will succeed in getting on the ballot?” Id., at 742 (emphasis added). Notably, we did not suggest that the District Court should consider whether one of the petitioners would actually find it more difficult than a reasonably diligent candidate to obtain the required signatures. What mattered was the general assessment of the burden.
Insofar as our election-regulation cases rest upon the requirements of the Fourteenth Amendment, see Anderson, 460 U. S., at 786, n. 7, weighing the burden of a nondiscriminatory voting law upon each voter and concomitantly requiring exceptions for vulnerable voters would effectively turn back decades of equal-protection jurisprudence. A voter complaining about such a law’s effect on him has no valid equal-protection claim because, without proof of discriminatory intent, a generally applicable law with disparate impact is not unconstitutional. See, e. g., Washington v. Davis, 426 U. S. 229, 248 (1976). The Fourteenth Amendment does not regard neutral laws as invidious ones, even when their burdens purportedly fall disproportionately on a protected class. A fortiori it does not do so when, as here, the classes complaining of disparate impact are not even protected.* See Harris v. McRae, 448 U. S. 297, 323, and n. 26 (1980) (poverty); Cleburne v. Cleburne Living Center, Inc., 473 U. S. 432, 442 (1985) (disability); Gregory v. Ashcroft, 501 U. S. 452, 473 (1991) (age); cf. Employment Div., Dept, of Human Re *208 sources of Ore. v. Smith, 494 U. S. 872, 878-879 (1990) (First Amendment does not require exceptions for religious objectors to neutral rules of general applicability).
Even if I thought that stare decisis did not foreclose adopting an individual-focused approach, I would reject it as an original matter. This is an area where the dos and don’ts need to be known in advance of the election, and voter-by-voter examination of the burdens of voting regulations would prove especially disruptive. A case-by-case approach naturally encourages constant litigation. Very few new election regulations improve everyone’s lot, so the potential allegations of severe burden are endless. A State reducing the number of polling places would be open to the complaint it has violated the rights of disabled voters who live near the closed stations. Indeed, it may even be the case that some laws already on the books are especially burdensome for some voters, and one can predict lawsuits demanding that a State adopt voting over the Internet or expand absentee balloting.
That sort of detailed judicial supervision of the election process would flout the Constitution’s express commitment of the task to the States. See Art. I, §4. It is for state legislatures to weigh the costs and benefits of possible changes to their election codes, and their judgment must prevail unless it imposes a severe and unjustified overall burden upon the right to vote, or is intended to disadvantage a particular class. Judicial review of their handiwork must apply an objective, uniform standard that will enable them to determine, ex ante, whether the burden they impose is too severe.
The lead opinion’s record-based resolution of these cases, which neither rejects nor embraces the rule of our precedents, provides no certainty, and will embolden litigants who surmise that our precedents have been abandoned. There is no good reason to prefer that course.
*209 The universally applicable requirements of Indiana’s voter-identification law are eminently reasonable. The burden of acquiring, possessing, and showing a free photo identification is simply not severe, because it does not “even represent a significant increase over the usual burdens of voting.” Ante, at 198. And the State’s interests, ante, at 191-197, are sufficient to sustain that minimal burden. That should end the matter. That the State accommodates some voters by permitting (not requiring) the casting of absentee or provisional ballots, is an indulgence — not a constitutional imperative that falls short of what is required.

A number of our early right-to-vote decisions, purporting to rely upon the Equal Protection Clause, strictly scrutinized nondiseriminatory voting laws requiring the payment of fees. See, e. g., Harper v. Virginia Bd. of Elections, 383 U. S. 663, 670 (1966) (poll tax); Bullock v. Carter, 405 U. S. 134,145 (1972) (ballot-access fee); Lubin v. Panish, 415 U. S. 709, 716-719 (1974) (ballot-access fee). To the extent those decisions continue to stand for a principle that Burdick v. Takushi, 504 U. S. 428 (1992), does not already encompass, it suffices to note that we have never held that legislatures must calibrate all election laws, even those totally unrelated to money, for their impacts on poor voters or must otherwise accommodate wealth disparities.