Opinión disidente emitida por la
Juez Asociada Señora Rodríguez Rodríguez.
“Mal tiempo para votar.”
José Saramago,

Ensayo sobre la lucidez

Blandiendo como excusa la defensa del derecho de las minorías a una representación adecuada en la Asamblea Legislativa, una exigua mayoría de este Tribunal le asesta una grave estocada a la Democracia puertorriqueña. Hoy, los miembros de la mayoría apocan el derecho del ciudadano a expresarse libre y soberanamente con su voto. Hoy, este Tribunal le anuncia a los puertorriqueños que un voto en blanco, o el voto protestado, o un voto por un personaje ficticio, no tiene ningún valor en nuestra Democracia, por lo que no hay por qué contarlo. Nunca antes en nuestra joven Democracia habíamos sido testigos del secuestro de la voluntad emitida en las urnas como el que hoy perpetra la mayoría.
Porque creo que un voto en blanco, o de nominación directa, o protestado, o por personajes ficticios, emitido en una elección general, o en un plebiscito, o en un referéndum o en unas primarias, constituye un método válido de expresión democrática mediante el ejercicio libre del voto, el cual se tiene que contabilizar, rechazo enérgicamente el curso de acción del Tribunal de resolver en contrario. No puede ser, que menos democracia sea preferible a más democracia.
Además, rechazo con igual vigor que para llegar al resultado que propone la mayoría se revoque el dictamen de *112 esta Alta Curia en Sánchez y Colón v. E.L.A. I, 134 D.P.R. 445 (1993). La implicación y repercusión de la revocación de Sánchez y Colón, ante, la veremos en futuros eventos electorales.
I
El giro que ha adoptado una mayoría de este Tribunal trastoca el derecho constitucional al voto y a la expresión de miles de puertorriqueños y puertorriqueñas, y desecha los principios rectores de los procesos electorales de este país. Se ignora así que nuestro sistema electoral se asienta en los principios democráticos consagrados en la Constitución del Estado Libre Asociado de Puerto Rico para asegurar el ejercicio “[d]el derecho al sufragio universal, igual, secreto, directo y libre, a través del cual cada ciudadano puede emitir el voto con arreglo a los dictados de su conciencia”. (Enfasis nuestro.) Art. 1.002 de la Ley Núm. 4 de 20 de diciembre de 1977 (Ley Electoral), 16 L.P.R.A. see. 3002. Derecho que se desvanece al adoptarse la posición de la mayoría, la cual embiste contra las prerrogativas de cada elector “a la libre emisión del voto y a que éste se cuente y se adjudique de la manera en que el elector lo emita”. (Énfasis nuestro.) Art. 2.001 de la Ley Electoral, 16 L.P.R.A. see. 3051(10). Se descarta, pues, el principio cimentado en la Constitución y reconocido en la Ley Electoral de que
... las tendencias electorales modernas exigen la capacidad de expresión con independencia de afiliación partidista para la protección de todos los ciudadanos que así lo desean. Por tal razón, ... los propósitos de existencia de un ordenamiento electoral descansan en unas garantías de pureza procesal capaces de contar cada voto en la forma y manera en que sea emitido. (Énfasis nuestro.) 16 L.P.R.A. see. 3002.
En un sistema que reconoce el ejercicio libre del derecho *113 ciudadano al voto y rechaza su obligatoriedad, es ineludible reconocer que la actuación del elector al acudir a las urnas y depositar un voto en blanco o por candidatos ficticios no constituye un acto democrático vacío de contenido. El voto depositado en blanco constituye una vía disponible al elector para “mostrar su disconformidad con la elección y, supuesto que nada le obliga a votar, lo más coherente es colegir de dicho voto su disconformidad con la opción presentada. Ello es más cierto en declaraciones irrisorias, que tradicionalmente se vienen asimilando a los votos en blanco”. J.A. Sardina-Páramo, Voto en blanco, abstencionismo electoral y derecho de resistencia, III Persona y Derecho: Revista de Fundamentación de las Instituciones Jurídicas 231, 239 (1976). Se presenta así la alternativa del voto depositado en blanco como “el ejercicio de un derecho de resistencia”. Id.
Sin más, la mayoría minusvalora el derecho al voto y pretende silenciar los dictámenes de conciencia de miles de puertorriqueños y puertorriqueñas que ejercen su derecho de manera distinta a lo que este Tribunal ahora entiende correcto.(1)
*114 II
Por otro lado, la revocación de Sánchez y Colón v. E.L.A. I, ante, se revela como una determinación totalmente innecesaria por lo planteado en este caso y cuya realidad en-mascara otros designios.(2)
En rigurosa juridicidad, la controversia que tuvimos ante nuestra consideración en Sánchez y Colón, ante, es disímil a la planteada en este caso. En Sánchez y Colón, ante, se cuestionó la constitucionalidad de la Ley Núm. 22 de 4 de julio de 1993 (1993 Leyes de Puerto Rico 101), que autorizaba la celebración de un referéndum de status con las fórmulas siguientes: Estado Libre Asociado, Estadidad e Independencia. Los demandantes alegaron que eran electores debidamente inscritos; que no estaban afiliados a ninguno de los tres partidos políticos; que no estaban de acuerdo con las definiciones de las fórmulas de status que se recogían en la papeleta; que la ley no les concedía una oportunidad de votar por las alternativas de su preferencia, y que todo ello les violaba su derecho al voto, a la libre expresión y asociación, y a la igual protección de las leyes, tanto bajo la Constitución del Estado Libre Asociado de Puerto Rico como la de Estados Unidos de América.
Confrontados con esta controversia, reconocimos que en materia de hermenéutica constitucional, cuando nos enfrentamos a estatutos que adolecen de inconstitucionalidad por subinclusión, ostentamos la facultad de extender los beneficios estatutarios a aquellos grupos o clases excluidos. Sánchez y Colón, ante, pág. 450. De acuerdo con este principio y considerando los hechos particulares de ese *115 caso, y como mecanismo para “superar las serias objeciones constitucionales planteadas por los demandantes”, le ordenamos a la Comisión Estatal de Elecciones que adjudicase “las papeletas que se depositen en blanco como un voto que no favorece ninguna de las definiciones de status propuestas por los partidos”. Sánchez y Colón, ante, págs. 450-451.
Así pues, las expresiones relacionadas con las papeletas en blanco se dan en el contexto de configurar un remedio que evitase declarar inconstitucional el evento electoral que se avecinaba. En otras palabras, ante los visos de inconstitucionalidad por subinclusión de que adolecía la Ley Núm. 22, teníamos que escoger entre dos alternativas, a saber: anular el proceso electoral o configurar un remedio que subsanara el problema de subinclusión de la ley. Naturalmente, se escogió el segundo camino. Es en este contexto que hay que interpretar lo que indicamos en Sánchez y Colón, ante, y visto así, se puede advertir con claridad meridiana que ello no guarda ninguna relevancia para el asunto que está ante nuestra consideración en este momento, más allá, claro está, de reconocer la importancia de la expresión de todo elector que ejerce su derecho al voto.
Lo que sí resolvimos en Sánchez y Colón, ante, y sobre lo cual la mayoría nada dice, fue que en un referéndum de “status” hay que proveerle a aquellos grupos o clases que quedan excluidos de las definiciones de “status” sobre las que se vota, un lugar en la papeleta donde se recoja su expresión. Lo que según la opinión de conformidad del Juez Asociado Señor Martínez Torres, a la que se le unen el Juez Asociado Señor Rivera Pérez y la Jueza Asociada Señora Pabón Charneco, constituye una “barrera al derecho de nuestro Pueblo a escoger su destino final”, es en realidad la garantía de los derechos del elector que prefiere emitir un voto en blanco en lugar de prestar su anuencia a cualquiera de las opciones contenidas en una papeleta de votación. Ese es el ratio de Sánchez, Colón, ante; esa es la importancia de *116 ese caso que tanto incomoda a la mayoría. Evidentemente, Sánchez y Colón, ante, poco tiene que ver —por no decir que nada— con cómo se cuentan los votos para efectos de la “Ley de Minorías”, que es la controversia en este caso a juicio de la mayoría. Indudablemente, para llegar a la conclusión a que llega el Tribunal hoy, en correcta metodología adjudicativa, éste no tenía que revocar a Sánchez y Colón, ante.
Llama marcadamente la atención que en ningún lugar de las sesenta y cuatro páginas de la opinión, el Tribunal explica lo que verdaderamente resolvimos en Sánchez y Colón, ante, y por qué es necesario ahora revocarlo en el contexto de este caso. Un silencio que es resonante y ensordecedor. Sin mucho apuro, parece razonable concluir que la controversia entre Jorge Suárez Cáceres y Angel Rodríguez Otero es secundaria; es, meramente, el pretexto utilizado para desdibujar la norma constitucional que exige que en un proceso de referéndum, al igual que un plebiscito, haya que proveer un espacio en la papeleta para aquellos grupos o clases de ciudadanos que no favorezcan las definiciones propuestas sobre las que se votará. Sánchez y Colón, ante, pág. 451. Entendido así, el curso de acción de la mayoría constituye un flagrante asalto a la Democracia.
La opinión mayoritaria comienza por delimitar el ámbito de la controversia ante su consideración al señalar que ésta se circunscribe a “definir el inciso (b) de la See. 7 del Art. Ill de nuestra Constitución, a los efectos de lo que entraña la expresión Votos depositados’ ” para determinar la proporcionalidad de los votos en la aplicación de la “disposición constitucional, también conocida como la ‘Ley de Minorías’ ”. (Escolio omitido.) Opinión mayoritaria, págs. 37-38. No obstante, el resultado al que arriba se extiende mucho más allá de los límites de la controversia anunciada como preámbulo. Más bien, la mayoría se vale del presente caso para atender una preocupación que excede por mucho los contornos de la controversia pautada, pues anuncia que los votos en blanco no deben utilizarse para establecer la *117 proporcionalidad de la votación en ningún procedimiento electoral, entiéndase, “elección, referéndum o plebiscito, entre otros eventos electorales”. (Enfasis suprimido.) Id., pág. 74.(3) Según surge de la opinión de conformidad del Juez Asociado Señor Martínez Torres, es en esto último y no en la controversia según indicada y delimitada en la opinión que reside la verdadera preocupación de los miembros de la mayoría.
Es decir, la razón de ser del dictamen de hoy no es lo que se nos dice en la opinión del Tribunal, a saber, cómo aplicar la “Ley de Minorías”, sino, como portentosamente expresa la opinión de conformidad, allanar el camino para un futuro referéndum o plebiscito de status. Siendo ése el deseo o interés de la mayoría, lo correcto en derecho hubiese sido esperar a que esa controversia estuviese concretamente ante nuestra consideración en el caso apropiado, que bajo ningún escenario es éste. No se debió desvirtuar la solución en este caso para adelantar el objetivo deseado en ese futuro caso.
En aras de alcanzar el resultado propuesto, la mayoría afirma, sin verdadero apoyo jurídico, que es antidemocrático autorizar que se cuenten las papeletas emitidas en blanco, pues las personas que votaron así no quisieron emitir un voto afirmativo a favor de los candidatos oficialistas, por lo que sus votos diluyen el voto partidista. Esta es una visión de corto aliento y poco calado sobre qué es y qué representa el voto, además de ser una visión que sólo sirve *118 para entronizar la partidocracia en nuestro país, en perjuicio de nuestra vida en democracia.(4)
De manera similar, la opinión de conformidad del Juez Asociado Señor Martínez Torres parte de la premisa equivocada de que lo que se reclama desde la postura disidente es la adjudicación de votos en blanco, por personajes ficticios o por nominación directa a favor de alguno de los candidatos o de las propuestas establecidas en determinada contienda electoral. Contrario a eso, proponemos que lo verdaderamente “justo y sensato” es contabilizar dichos votos y hacerlos parte del universo de votos al momento de calcular la proporción de votos obtenidos por un candidato o propuesta. Lo que constituye una realidad artificial es presentar, como proporción de votos adjudicados a favor de un candidato, una cifra que en su denominador deja de lado miles de papeletas que fueron depositadas en la urna por electores inscritos, quienes ejercieron su voto según lo dictó su conciencia. Puede ser cierto que nadie sepa cuál fue la intención de ese elector al votar como lo hizo; sólo podemos presumir razonablemente distintas intenciones. Lo que definitivamente podemos saber a ciencia cierta, porque es contabilizable, es la totalidad de votos emitidos, no importa la intención que pudiese haber tenido el elector al ejercerlo.
Como intento adicional de justificar su posición, la opinión mayoritaria cita párrafos y expresiones sueltas de Burdick v. Takushi, 504 U.S. 428 (1992), sin explicar cómo dicho caso apoya su errada conclusión. Y es que a poco se examina dicho caso, se advierte que la controversia a la cual se enfrentó el Tribunal Supremo de Estados Unidos en esa ocasión es muy distinta a la situación que creó la mayoría en este caso. En Burdick, el Tribunal Supremo examinó una disposición en la ley electoral de Hawaii que prohibía votar por candidaturas por nominación directa *119 Cwrite-in), por lo que no existía un espacio en la papeleta electoral para este tipo de votación. El Tribunal declaró la ley constitucional según la Primera y la Decimocuarta Enmiendas de la Constitución de Estados Unidos, pues el sistema de Hawaii proveía a los ciudadanos del estado un acceso suficiente a la papeleta, a través de la celebración de primarias a las cuales se podía nominar candidatos hasta sesenta días antes de la elección, sin tener que necesariamente estar afiliado a algún partido político. Según el Tribunal, ese sistema de regulación de elecciones sólo imponía una carga limitada en los derechos de los votantes frente a los intereses del Estado en operar elecciones de manera eficiente, pues éste contenía una manera adecuada a través de la cual se podían hacer viables e incluir opciones de votación distintas. Concluye el Tribunal, en una nota al calce, indicando: “[w]e of course in no way suggest that a State is not free to provide for write-in voting, as many States do; nor should this opinion he read to discourage such provisions.” (Enfasis nuestro.) Burdick, ante, pág. 441 esc. 11. Acomodaticiamente, la mayoría soslaya esta admonición y actúa contrario a lo que allí se asevera.
En suma, en Burdick v. Takushi, ante, el Tribunal Supremo de Estados Unidos dispuso el estándar al amparo del cual se debe analizar la validez de las leyes estatales que imponen límites al ejercicio electoral. Nada se determinó en relación con cuándo y para qué propósitos se debe contabilizar los votos emitidos en blanco por los electores. No vemos cómo la opinión mayoritaria extrapola dicha decisión para la interpretación de una disposición de la Constitución del Estado Libre Asociado de Puerto Rico. Es evidente que el caso poco tiene que ver con la contabilización de papeletas en blanco, protestadas o en las cuales se no-mine directamente a un personaje ficticio.
La mayoría, con la inclusión de las citas inconexas del caso relacionado anteriormente, quiere establecer que no se debe tomar en consideración expresiones de disenso a *120 través del voto, que no sea votar por uno de los candidatos o propuestas presentadas. Difícil es, en nuestros días, ex-presar disenso en otras avenidas como sugiere la opinión mayoritaria, cuando se cierran los oídos a los reclamos de sectores minoritarios bajo “la premisa básica de nuestro ordenamiento constitucional [de] que la mayoría gobierna...”. Opinión mayoritaria, pág. 75.
El voto en blanco, protestado o por un personaje ficticio es el medio a través del cual todos aquellos que no se sienten representados por las opciones disponibles, puedan así expresarlo. Ya durante la Convención Constituyente se señaló precisamente la importancia de este ejercicio: “La democracia ... conlleva, entre otros derechos: el derecho a no votar por nadie o a votar por algo que es distinto a lo que está en controversia pero que por el mecanismo electoral o político no lo ha puesto el Estado en la elección para que el pueblo pueda opinar sobre eso ....” 2 Diario de Sesiones de la Convención Constituyente 1410 (1961).
Al escogerse el camino de la mayoría, pierde legitimidad este ejercicio electoral, pues ya no es cierto que “cada voto cuenta”, sino que ahora cuentan los votos que la mayoría de este Tribunal entiende “válidos” o conllevan una expresión lo suficientemente clara, en su criterio, como para ser incluidos. Eso no es lo que dicta la Constitución ni lo que se espera de una democracia que garantiza la participación de todos en el gobierno. La contabilización e inclusión de los votos en blanco, por nominación directa, protestados y por personajes ficticios en el total de votos no inclinaría la balanza a favor de nadie, como erradamente insisten la mayoría y la opinión de conformidad. No se trata de adjudicar un voto por “nadie” a favor de alguien o algo, sino de adjudicarlo como parte del universo de votos emitidos al cual éstos pertenecen. La inclusión de esos votos demostraría la realidad de lo que ocurrió el día de las elecciones.
Así que, distinto a lo expresado en la opinión de conformidad, de contabilizarse los votos en controversia, no se *121 rían los temidos personajes caricaturescos quienes elegirían el candidato que debe ocupar el puesto vacante del Senado de Puerto Rico; sería la participación de todos los votantes que acudieron a las urnas y cuya expresión, mediante fíat judicial, ha sido eliminada hoy. Ya no es el electorado quien eligió al senador del escaño vacante, sino los cuatro integrantes de la mayoría, quienes decidieron a quién pertenece dicho escaño, asestándole un rudo golpe a la democracia.
III
Recapitulando, el voto en blanco es igual de democrático que cualquier voto expreso. Es la expresión consciente de protesta ciudadana en las urnas. Es la afirmación responsable del ciudadano quien por infinidad de razones no se siente representado por los partidos políticos existentes y sus propuestas, o por las fórmulas de status que puedan incluirse en una papeleta, pero quien sí cree en el sufragio libre y soberano, como también cree en la Democracia, y por ello acude a las urnas para expresarse.
Si no se contabiliza este voto, se escamotea una expresión concreta del ciudadano. Si el voto en blanco asusta, es precisamente porque es democrático. En este tenor, concluyo con un fragmento de la obra que citáramos como preámbulo de esta exposición:
A las diez de la noche, finalmente, apareció en televisión el primer ministro. Venía con el rostro demudado, con ojeras profundas ..., pálido a pesar del maquillaje. Traía un papel en mano, pero casi no leyó. ... Queridos conciudadanos, dijo, el resultado de las elecciones que hoy se han realizado en la capital es el siguiente, partido de la derecha, ocho por ciento, partido del medio, ocho por ciento, partido de la izquierda, uno por ciento, abstenciones, cero, votos nulos, cero, votos en blanco, ochenta y tres por ciento .... Honrad la patria, que la patria os contempla, con redoble de tambores y clarines sonantes. José Saramago, Ensayo sobre la lucidez.
*122 Por desolado y escarpado camino marcha ahora la Democracia puertorriqueña.

 No podemos menos que recordar en estos momentos las sabias palabras de Thomas Paine:
“The true, and only true basis for representative government is equality of rights. Every man has the right to one vote. ...
“The only ground upon which exclusion from the right for voting is consistent with justice, would be to inflict it as a punishment for a certain time upon those who should propose to take away the right from others. The right of voting ... is the primary right by which others rights are protected. To take away this right is to reduce a man to a state of slavery, for slavery consist in being subject to the will of another, and he that has not a vote in the election ..., is in this case. The proposal, therefore, to disfranchise any class of men is ... criminal. ... When we speak of right, we ought always to unite with it the idea of duties; right becomes duties by reciprocity. The right which I enjoy becomes my duty to guarantee it to another and he to me; and those who violate the duty justly incur a forfeiture of the right.” (Enfasis nuestro.) T. Paine, Dissertation on the First Principles of Government, en Rights of Men Common Sense and Other Political Writings, Mark Philp ed., Oxford University Press, 1998, págs. 396-398.

 Sobre los méritos de la opinión emitida hoy, nada más hay que añadir, sobre el aspecto de justiciabilidad, que lo ya reseñado en la opinión disidente emitida por el Juez Presidente Señor Hernández Denton en ocasión de que se expidiera el auto. Sin embargo, es conveniente observar que, contrario al análisis esbozado por la mayoría, la determinación sobre quién constituye parte en el presente procedimiento es una controversia de derecho que en nada depende de la deferencia judicial que los tribunales apelativos estamos compelidos a brindar a las determinaciones de hechos de los tribunales inferiores.

 Es preciso reconocer que, en el contexto de la “Ley de Minorías”, contabilizar los votos en blanco para determinar la proporcionalidad podría incidir en el resultado. Ello obedece a que las proporciones comparadas resultan de electores correspondientes a distintos distritos electorales. No obstante, en los casos en los que el denominador es el mismo para todas las alternativas disponibles, contabilizar los votos depositados en blanco no alteraría la diferencia proporcional entre las alternativas presentadas en la papeleta. El único efecto sería incorporar el voto emitido por cada elector como parte del denominador sobre el cual deben calcularse los totales resultantes. Sería, pues, inaplicable en dichos escenarios la premisa articulada por la opinión mayoritaria de que contar el voto en blanco serviría para favorecer a uno u otro candidato contra la voluntad del elector.

 Véase S.P. Huntington, How Countries Democratize, 124 (Núm. 1) Pol. Sc. Q. 31 (2009).