48 F.3d 493
 COALITION FOR FREE AND OPEN ELECTIONS, PROHIBITION PARTY;
Earl F. Dodge, Prohibition Nominee for President of the
United States; George Obmsby, Prohibition Nominee for
Vice-President of the United States; Luther Kennicutt;
Walter Kennicutt; Hazelle Kennicutt; Aaron Strange;
Eileen Schumaker; Robert M. Blair; Mrs. Robert M. Blair;
Hylda Shillington; New Alliance Party; Lenora B. Fulani,
Nominee for the Nomination of the New Alliance Party for
President of the United States; Socialist Party USA; J.
Quinn Brisben, Socialist Party Nominee for President of the
United States; William D. Edwards, Socialist Party Nominee
for Vice-President of the United States; Maria Luikart;
Evelyn Powell; Darin Rohrer; Dan Boggs; Elizabeth S.
Sargent; Michael Griffith, Plaintiffs-Appellants,
v.
Betty McELDERRY, Chairman of the Oklahoma State Election
Board; Mona Lambird, Vice-Chairman of the Oklahoma State
Election Board; Lance Ward, Secretary of the Oklahoma State
Election Board; George Krumme, Member of the Oklahoma State
Election Board; Oklahoma State Election Board, Defendants-Appellees.
 No. 93-6151.
 United States Court of Appeals,
Tenth Circuit.
 Feb. 27, 1995.
 
 James C. Linger of Butler & Linger, Tulsa, OK, for plaintiffs/appellants.
 Rabindranath Ramana, Asst. Atty. Gen., Oklahoma City, OK, (Susan B. Loving, Atty. Gen., Oklahoma City, OK, with her on the brief), for defendants/appellees.
 Before MOORE, EBEL, Circuit Judges, and VRATIL, District Judge.*
 EBEL, Circuit Judge.
 
 
 1
 Plaintiffs-Appellants, the Coalition for Free and Open Elections, et al., appeals the district court's grant of summary judgment in favor of Defendants-Appellees, the Oklahoma State Election Board, et al., ("Oklahoma"), holding Oklahoma's ban on write-in votes for Presidential and Vice-Presidential elections constitutional. We AFFIRM.
 
 BACKGROUND
 
 2
 The Coalition, several minor political parties, their Presidential and Vice-Presidential candidates, and individuals who wanted to vote for them challenge Oklahoma's election laws to the extent that such laws statutorily ban write-in voting in Presidential and Vice-Presidential elections.[1]
 
 
 3
 Specifically, Appellants raise a First and Fourteenth Amendment challenge to Oklahoma Statute Title 26, Sec. 7-127(1), which provides: "If the name of any person is written on a ballot, said name shall not be counted." Appellants do not argue that every ban on write-in voting is unconstitutional. Instead, they argue that Oklahoma's ban as applied to Presidential and Vice-Presidential elections is unconstitutional when considered in conjunction with Oklahoma's other ballot access laws. Appellants reason that the constitutionality of a ban on write-in voting cannot be judged in a vacuum, and that the more restrictive a State's other means of ballot access are, the more critically such a ban must be viewed. Because Oklahoma's ballot access laws require early filing deadlines and a large number of signatures in order for a candidate to be placed on the general election ballot, Appellants contend that Oklahoma's write-in ban for Presidential and Vice-Presidential elections fails this critical review.
 
 
 4
 Because we agree that there is a relationship between a State's ability to ban write-in voting and the ability of candidates to gain ballot access in other ways, see Burdick v. Takushi, --- U.S. ----, ----, 112 S.Ct. 2059, 2067, 119 L.Ed.2d 245 (1992), our review of Oklahoma's write-in ban necessarily requires us to analyze Oklahoma's ballot access laws. Oklahoma law provides four alternatives to write-in voting for a Presidential elector to be listed on the general election ballot: (1) as an elector for a recognized political party, Okla.Stat. tit. 26, Secs. 1-108, 10-101; (2) as an uncommitted elector, id. Sec. 10-101; (3) as an elector for an independent candidate, id. Sec. 10-101.1; or (4) as an elector for an unrecognized political party, id. Sec. 10-101.2.
 
 
 5
 To get placed on the election ballot under Oklahoma's first alternative--as a Presidential elector for a recognized political party--it is first necessary that the party itself obtain "recognized" status. In order to become a recognized political party, the party must file a notice of intent to form a political party, which may not be done between March 1 and November 15 of an even-numbered year (i.e., an election year). Id. Sec. 1-108(1). Within one year following such a filing, the party must then obtain signatures of registered voters equal to at least 5% of the total votes cast in the preceding general election for Governor or for Presidential electors. Id. Sec. 1-108(2).[2] The party may not obtain these signatures between May 31 and November 15 of an election year. Id. If these signatures are timely obtained, the party will be a "recognized party" for the subsequent general election, with the caveat that a recognized party may not be formed between July 1 and November 15 of an election year. Id. Secs. 1-108, 1-108(3). The party then must select its Presidential electors at a statewide convention and certify the elector nominees not more than 180 days, nor fewer than 90 days, before the general election at issue (i.e., between early May and early August). Id. Sec. 10-101. The party remains a recognized party so long as its nominees for Governor or Presidential electors receive at least 10% of the total votes cast for said office at each election. Id. Sec. 1-109. If not, the party must complete the steps for recognition anew. Id.
 
 
 6
 To get placed on the election ballot under Oklahoma's second alternative--as an uncommitted Presidential elector--one must file by July 15 of the presidential election year petitions containing signatures of registered voters equal to at least 3% of the total votes cast in the last general election for President. Id. at Sec. 10-101(1).
 
 
 7
 To get placed on the election ballot under Oklahoma's third alternative--as a Presidential elector for an independent candidate--one must file petitions conforming to the same rules and timing requirements as uncommitted Presidential elector candidates. Id. at Sec. 10-101.1(1). Additionally, a list of the nominees for electors pledged to the independent Presidential candidate and the name of the Vice-Presidential running mate must be filed by September 1 of the election year, id. at Sec. 10-101.1(3), almost one full month after recognized parties are required to certify their elector nominees, see id. at Sec. 10-101. The elector nominees must then file by September 15 their signed oaths to cast their ballots, if elected, for the named independent Presidential and Vice-Presidential candidates. Id. at Sec. 10-101.1(3).
 
 
 8
 To get placed on the election ballot under Oklahoma's fourth alternative--as an elector for an unrecognized political party--the party must file signature petitions conforming to the same rules and timing requirements as uncommitted electors and electors for independent candidates. Id. Sec. 10-101.2(1). The unrecognized party must also file a notice of intent to circulate these petitions prior to actual circulation. Id. The same certification and oaths that an elector for an independent candidate must file are also required. Id. Sec. 10-101.2(3).
 
 
 9
 It is against this backdrop of Oklahoma's other ballot access laws that Appellants advance their position that Oklahoma's ban on write-in voting in Presidential elections is an impermissible burden on their First and Fourteenth Amendment rights. Oklahoma argues that its ban on write-in voting does not impermissibly burden Appellants' constitutional rights because, under the balancing test set forth by the Supreme Court in Anderson v. Celebrezze, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), and Burdick v. Takushi, --- U.S. ----, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992), and the Tenth Circuit's application of that test in Rainbow Coalition v. Oklahoma State Election Bd., 844 F.2d 740 (10th Cir.1988), its interests justifying the ban outweigh any burdens on Appellants' rights. The district court agreed with Oklahoma's position and granted Oklahoma's motion for summary judgment. Appellants challenge that decision in this appeal.
 
 DISCUSSION
 
 10
 We review the grant of summary judgment de novo, applying the same legal standard as the district court. Universal Money Ctrs., Inc. v. AT & T, 22 F.3d 1527, 1529 (10th Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 655, 130 L.Ed.2d 558 (1994). Summary judgment is appropriate if there is no genuine issue as to any material fact and Oklahoma, the moving party, is entitled to judgment as a matter of law. Id. Because there is no dispute of material fact, we consider only whether the district court correctly concluded that Oklahoma was entitled to judgment under the applicable substantive law. See Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir.1990).
 
 
 11
 When reviewing the constitutionality of State burdens on the right to vote, we must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration not only "the legitimacy and strength of each of those interests," but also "the extent to which those interests make it necessary to burden the plaintiff's rights." Anderson v. Celebrezze, 460 U.S. 780, 789, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547 (1983). This "balancing test" has been reaffirmed by the Tenth Circuit in Rainbow Coalition v. Oklahoma State Election Bd., 844 F.2d 740, 743 (10th Cir.1988), and in Hagelin for President Comm. of Kan. v. Graves, 25 F.3d 956, 959 (10th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 934, 130 L.Ed.2d 880 (1995).
 
 
 12
 The Supreme Court clarified this standard in Burdick v. Takushi, by explaining that
 
 
 13
 [u]nder this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to severe restrictions, the regulation must be narrowly drawn to advance a state interest of compelling importance. But when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions.
 
 
 14
 --- U.S. at ----, ---- - ----, 112 S.Ct. at 2059, 2063-64 (internal citations omitted). Accordingly, a court must first review the State's overall ballot access scheme, weighing the State's interests in ballot access restrictions against the burdens those restrictions impose on voters' interests.
 
 
 15
 When the Supreme Court applied this balancing test in response to a specific challenge to a ban on write-in votes in Burdick, it went on to hold "that when a State's ballot access laws pass constitutional muster as imposing only reasonable burdens on First and Fourteenth Amendment rights[,] ... a prohibition on write-in voting will be presumptively valid, since any burden on the right to vote for the candidate of one's choice will be light and normally will be counterbalanced by the very state interests supporting the ballot access scheme." Burdick, --- U.S. at ----, 112 S.Ct. at 2067 (reviewing Hawaii's ban on write-in voting). Thus, a court must determine, secondly, if the competing interests are such that this presumption should be overcome.
 
 
 16
 Following this two-step process outlined in Burdick, we first review the legitimacy of Oklahoma's ballot access laws for Presidential electors and conclude in Part I that, as in Burdick, those laws "pass constitutional muster." In Part II, we then address whether the resulting presumption that Oklahoma's ban on write-in voting is valid should be overcome, and conclude that the presumption prevails in this case. Accordingly, we agree with the district court that Oklahoma was entitled to judgment as a matter of law.
 
 I. Oklahoma's Ballot Access Laws
 
 17
 As mentioned above, Oklahoma's ballot access laws provide four alternatives to write-in voting for Presidential electors to gain access to a general election ballot: as an elector for a recognized political party, as an uncommitted elector, as an elector for an independent candidate, and as an elector for an unrecognized political party.
 
 
 18
 We have previously reviewed and upheld Oklahoma's ballot access laws governing the first of these alternatives in Rainbow Coalition, 844 F.2d 740. Specifically, we reviewed the laws requiring signature petitions for recognized party status to be filed no later than May 31 of the election year with the signatures of registered voters equal to at least 5% of the votes cast in the last election for Governor or for Presidential electors. In Rainbow, we upheld both the early filing deadline and the 5% threshold. Id. at 744, 747. The Rainbow court balanced the voters' freedom of expression and association rights embodied in the right to vote against Oklahoma's interests in running an orderly and timely election and found that Oklahoma's interests prevailed. We were somewhat troubled by the early filing deadline, but found that the State had a sufficient interest in such an early deadline because it needed to verify the signatures on the petitions, conduct primary elections and run-off primaries if necessary, allow challenges to the candidates' qualifications, administer recounts, allow judicial resolution of election challenges, print ballots, and mail out and receive absentee ballots. Id. at 745-47.
 
 
 19
 Appellants argue, however, that Rainbow does not end our inquiry because it only involved review of Oklahoma's access laws governing recognized party status. Appellants are correct that in Rainbow we did not address Oklahoma's ballot access laws as they pertain to uncommitted electors, electors for independent candidates, and electors for unrecognized parties.[3] As a practical matter, however, Rainbow's discussion of the impact on voters' rights of the filing deadlines and signature petition requirements for gaining ballot access through the recognized party route sheds much light on our review of Oklahoma's ballot access laws for uncommitted electors, electors for independent candidates, and electors for unrecognized parties.[4]
 
 
 20
 In contrast to the May 31 filing deadline for recognized party electors that we upheld in Rainbow, Oklahoma requires nonrecognized party electors to submit their signature petitions by July 15 of the election year. This deadline is only about two weeks before the latest date on which recognized party candidates must declare their elector nominees and approximately six weeks after recognized party petitions must be filed. Nonrecognized party electors do not have to declare their elector nominees until September 1, approximately one month after the latest date on which recognized parties must declare their elector nominees. Thus, we conclude that the ballot access burdens for nonrecognized parties are not as severe as the burdens placed on recognized parties that we have already held in Rainbow to be constitutional. Although we noted in Rainbow that a State does have a "greater interest" in imposing restrictions on the organization of new political parties than on ballot access for minority candidates because of the additional need "to provide assurance that the particular party designation has some meaning," many of the other state interests listed in Rainbow still exist to outweigh the less onerous burden of the later filing deadline for nonrecognized party electors.[5] See Rainbow, 844 F.2d at 746 n. 9 (internal quotation omitted). Thus, we find that the July 15 deadline for the signature petitions of nonrecognized party electors, like the May 31 deadline for recognized party electors upheld in Rainbow, "passes constitutional muster" as well.
 
 
 21
 In contrast to the petition requirement that we upheld in Rainbow, which required recognized parties to file signature petitions equal to at least 5% of the votes cast in the last election for Governor or for Presidential electors, Oklahoma law requires electors for nonrecognized parties to submit petitions with signatures of registered voters equal to at least 3% of the total votes cast in the most recent Presidential election. Because the 3% requirement is less burdensome than the 5% requirement we upheld in Rainbow, we find the 3% requirement constitutional as well.[6] This conclusion is bolstered by the fact that the names of nonrecognized party electors may be submitted almost one full month after recognized parties must certify the names of their elector nominees. Okla.Stat. tit. 26, Secs. 10-101.1(3), 10-101.
 
 
 22
 Thus, under the standards set forth in Anderson and Burdick, we conclude that Oklahoma's ballot access laws governing nonrecognized party electors, like those governing recognized party electors, impose only reasonable burdens on Appellants' First and Fourteenth Amendment rights. See Rainbow, 844 F.2d 740.
 
 II. Ban on Write-In Votes
 
 23
 Because we find Oklahoma's ballot access laws constitutional, we also conclude that Oklahoma's challenged ban on write-in voting is presumptively valid. See Burdick, --- U.S. at ----, 112 S.Ct. at 2967. As the Court stated in Burdick, "when a State's ballot access laws pass constitutional muster as imposing only reasonable burdens on First and Fourteenth Amendment rights--as do Hawaii's election laws--a prohibition on write-in voting will be presumptively valid, since any burden on the right to vote for the candidate of one's choice will be light and normally will be counterbalanced by the very state interests supporting the ballot access scheme." Id.
 
 
 24
 Oklahoma asserted this presumption and articulated a number of State interests furthered by its ban on write-in voting. These interests include discouraging unrestrained factionalism in the general election, limiting the general election to recognized parties and to those parties and candidates that are well supported as evidenced by their ability to meet the signature requirements, focusing the voters on major issues and candidates, and conserving state resources by reducing the risk that resources will be used to count votes for fictitious candidates or those unwilling or unqualified to serve in public office.[7] Oklahoma was the first state to implement "a uniform, standardized system of voter registration, election administration and voting statewide.... Hand evaluation and counting of ballots designed for electronic counting devices would defeat major advantages of the counting devices. Subjectivity of counters would be reintroduced into the system, timely results would be delayed and hand counting costs would be reintroduced." Affidavit of Lance Ward, Secretary of the Oklahoma State Election Board, Appellants' App. at 18, pp 1, 5. The State's interest in voter education is also served because the ballot access laws combined with the ban on write-in voting encourage candidates and parties to publicize their candidacy early enough to allow for extended public debate.
 
 
 25
 To overcome Oklahoma's asserted interests and Burdick 's rebuttable presumption that Oklahoma's ban on write-in voting is valid, Appellants challenge Burdick 's applicability on three grounds. First, Appellants contend that Burdick 's presumption does not apply to Presidential and Vice-Presidential elections. Second, Appellants claim that Burdick 's presumption does not apply because Oklahoma's ballot access laws are more onerous than the ballot access laws of Hawaii that triggered the presumption of validity for Hawaii's write-in voting ban. Third, Appellants assert that Oklahoma has less interest in a Presidential election than in a state or local election, thereby overcoming the presumption in this case. We address and reject each of Appellants' challenges in turn.
 
 
 26
 Appellants first argue that Burdick does not apply here because the Burdick Court did not discuss Hawaii's ban on write-in voting specifically in the context of a Presidential election. However, as the district court correctly pointed out, the Burdick Court reviewed Hawaii's ban on write-in voting by applying the balancing test set forth in Anderson--a balancing test articulated in the context of a challenge to State laws restricting ballot access laws in a Presidential election. Burdick, --- U.S. at ----, 112 S.Ct. at 2063 (applying Anderson, 460 U.S. at 789, 103 S.Ct. at 1570, which reviewed a challenge to an early filing deadline for independent Presidential candidates).[8] Thus, even if the specific state and voter interests to be balanced in evaluating whether to rebut Burdick 's presumption of validity for write-in voting bans differ in the context of a Presidential election, the presumption itself still applies whenever, as here, the State's ballot access laws are constitutional.
 
 
 27
 Appellants second contention is that Burdick does not apply because Oklahoma's ballot access laws are more onerous than Hawaii's. However, even if Appellants were correct that Oklahoma's ballot access laws are more restrictive than Hawaii's, Appellants would not have shown enough to avoid Burdick 's presumption. For Burdick 's presumption not to attach, Appellants would have to show not just that Oklahoma's ballot access laws are more restrictive than Hawaii's, but that Oklahoma's ballot access laws are so restrictive as to burden impermissibly voters, constitutional rights--a proposition that we have already concluded is not the case.
 
 
 28
 At any rate, it is unclear to us that Oklahoma's ballot access laws are indeed more burdensome than Hawaii's laws. Although Hawaii's ballot access laws make it easier to gain ballot access in a nonpartisan primary election, Hawaii's laws actually may make it more difficult to gain access to a general election ballot. While Hawaii's ballot access laws only require 15 to 25 signature petitions to participate in the nonpartisan primary, to get on the general election ballot a candidate has to win either 10% of the primary vote or the number of votes that was sufficient to nominate a partisan candidate, whichever is less. Burdick, --- U.S. at ----, 112 S.Ct. at 2065 (citing Haw.Rev.Stat. Secs. 12-3 to 12-7). Only 8 of 26 nonpartisans who entered the nonpartisan primaries in the last ten years have overcome this second hurdle to gain ballot access in the general election. Id. at ----, 112 S.Ct. at 2065. While Oklahoma's ballot access laws, in contrast, require nonrecognized party electors to obtain far more signature petitions, Oklahoma does not have Hawaii's restrictive rules governing advancement from a primary to general election ballot. Additionally, to gain recognized party status in Hawaii, the party must submit petitions 150 days before the general election (in early June) with signatures equal to 1% of all registered voters, id. at ----, 112 S.Ct. at 2064 (citing Haw.Rev.Stat. Sec. 11-62); whereas, to gain recognized party status in Oklahoma, the party has through May 31 to submit petitions with signatures of 5% of only those registered voters who voted in the last election for Governor or for Presidential elector. Okla.Stat. tit. 26, Sec. 1-108(2). Thus, because it is not clear that Hawaii's ballot access laws are less burdensome than Oklahoma's, or at least not substantially more burdensome, Burdick 's presumption may not be challenged on this ground.
 
 
 29
 Appellants' third argument is that even if Burdick 's presumption attaches to the write-in ban in this case, that presumption should be overcome because the State has less of an interest in regulating a Presidential election. Appellants are correct that the State's interest in banning write-in votes is less in Presidential elections than in State and local elections. The Anderson Court said that,
 
 
 30
 in the context of a Presidential election, state-imposed restrictions implicate a uniquely important national interest. For the President and Vice President of the United States are the only elected officials who represent all the voters in the Nation. Moreover, the impact of the votes cast in each State is affected by the votes cast for the various candidates in other States. Thus in a Presidential election a State's enforcement of more stringent ballot access requirements, including filing deadlines, has an impact beyond its own borders. Similarly, the State has a less important interest in regulating Presidential elections than statewide or local elections, because the outcome of the former will be largely determined by voters beyond the State's boundaries.
 
 
 31
 460 U.S. at 794-95, 103 S.Ct. at 1573 (footnotes omitted). Anderson does not, however, stand for the proposition that every state regulation of Presidential elections will fail to pass constitutional muster. Instead, in determining whether Burdick 's presumption should be overcome in this case, Anderson simply instructs us to consider the uniquely national interests involved in Presidential elections when we balance the interests at stake.
 
 
 32
 Although Oklahoma does have less of an interest in regulating Presidential elections than state or local elections, Appellants' interest in write-in voting is also less in this context. In Burdick, the Court explained that the primary function of the election process is "to winnow out and finally reject all but the chosen candidates, not to provide a means of giving vent to short-range political goals, pique, or personal quarrel[s]. Attributing to elections a more generalized expressive function would undermine the ability of States to operate elections fairly and efficiently." --- U.S. at ----, 112 S.Ct. at 2066 (internal citations omitted). In the context of a Presidential election, the function of actually getting a candidate elected is only nominally advanced by the use of write-in voting, because of the extreme unlikelihood that a write-in campaign for President could ever be successful.[9] In this context, rather than serving to "winnow out" the field and getting a candidate elected, write-in voting primarily serves the expressive function described in Burdick:
 
 
 33
 [T]he objection to the specific ban on write-in voting amounts to nothing more than the insistence that the State record, count, and publish individual protests against the election system or the choices presented on the ballot through the efforts of those who actively participate in the system. There are other means available, however, to voice such generalized dissension from the electoral process; and we discern no adequate basis for our requiring the State to provide and to finance a place on the ballot for recording protests against its constitutionally valid election laws.
 
 
 34
 Burdick, --- U.S. at ----, 112 S.Ct. at 2067. Thus, while we acknowledge, as the court did in Burdick, that voters do have a right "to make free choices and to associate politically through the vote," the Court has made it clear that reasonable regulations advancing the primary function of the election process will be upheld, even when they "have the effect of channeling expressive activity at the polls." Id. at ----, 112 S.Ct. at 2066. Thus, even though Oklahoma has a lesser interest in regulating ballot access in a Presidential election than a state or local election, Oklahoma's asserted interests still outweigh the voters' diminished interest in write-in voting in the context of a Presidential election.
 
 
 35
 Thus, having determined that Oklahoma's ballot access laws do not impermissibly burden voters' constitutional rights and that Burdick 's presumption of validity therefore attaches to Oklahoma's ban on write-in voting, we conclude that Appellants interests are not strong enough to overcome that presumption.
 
 CONCLUSION
 
 36
 Accordingly, we AFFIRM the district court's grant of summary judgment to Appellees.
 
 
 
 *
 The Honorable Kathryn H. Vratil, United States District Judge for the District of Kansas, sitting by designation
 
 
 [1]
 The parties stipulated that the individual Oklahoma voters who wished to cast their votes by write-in for President and Vice-President were the only necessary Plaintiffs to challenge the constitutionality of the statutes at issue
 
 
 [2]
 Because the election for Governor takes place in the alternate even-numbered year when there is no Presidential election, the number of total votes cast will be determined sometimes by a Presidential election and sometimes by a Gubernatorial election
 
 
 [3]
 In Rainbow, the plaintiffs did raise an additional challenge to the Oklahoma law that prevents members of nonrecognized political parties from designating their party affiliation on the voter registration rolls. 844 F.2d at 747. However, the plaintiffs in Rainbow did not challenge more generally Oklahoma's laws governing ballot access for nonrecognized party electors
 
 
 [4]
 Hereinafter, uncommitted electors, electors for independent candidates, and electors for unrecognized parties are collectively referred to as "nonrecognized party electors."
 
 
 [5]
 For example, Oklahoma's need to count and verify the signatures on the petitions early enough to allow said petitioners to be notified of their right to be on the ballot so that the petitioners can timely comply with the September 1 deadline to submit their nominee certifications and the September 15 deadline to submit the oaths of its pledged electors is similar to its needs to timely count and verify recognized party petition signatures articulated in Rainbow
 
 
 [6]
 The nonrecognized parties really have two chances to get on the ballot. They can first attempt to meet the May 31 deadline and 5% signature threshold to be recognized as a party. If they fail to meet either of these requirements, they can attempt to meet the July 15 deadline and 3% signature threshold. In fact, it seems that they can go door to door with both sets of petitions so that they keep their second option viable if they fail to meet the stricter requirements under the recognized party provisions
 
 
 [7]
 Oklahoma uses automated vote counting, which does not currently allow for the counting of write-in votes. The costs to count write-in votes for all elections was estimated at $1 million. The district court found, however, that "[t]he costs of counting write-in votes only in general presidential elections would not appear to be prohibitive." See District Court Order, March 26, 1993, at 12; see also Affidavit of Lance Ward, Secretary of the Oklahoma State Election Board, Appellants' App. at 18 (stating that the initial cost to rewrite the software so that it would segregate ballots containing write-in votes to enable those votes to be hand-counted was "unknown")
 
 
 [8]
 Moreover, the petitioner in Burdick challenged the constitutionality of Hawaii's ban on write-in voting not only in the non-Presidential election specifically at issue in the case, but also in future elections, which would presumably include elections for Presidential electors. Burdick, --- U.S. at ----, 112 S.Ct. at 2061 (The petitioner claimed "that he wished to vote in the primary and general elections for a person [for Hawaii's House of Representatives] who had not filed nominating papers and that he wished to vote in future elections for other persons whose names were not and might not appear on the ballot." (emphasis added)). Even in the face of this broad-based challenge, however, the Burdick Court did not explicitly exclude Presidential elections from its analysis
 
 
 [9]
 The potential effectiveness of write-in voting in a Presidential election is further diminished in Oklahoma, which requires all its Presidential electors to cast their votes for the plurality winner in the general election. Thus, Oklahoma has an additional interest in having its voters use their votes for viable candidates who have exhibited some degree of support through the ballot access process