Rodney **DRIVER**, Harold A. Nomer, RI Political Action Committee for Education

v.

Joseph **DISTEFANO** in his capacity as Chairman of RI Board of Elections.

Civil Action No. 94–0417–T.

United States District Court, D. Rhode Island.

Feb. 8, 1996.

Neal J. McNamara, Flanders & Medeiros, Providence, RI, for Plaintiffs.

Anthony J. Bucci, Jr., Licht & Semonoff, Providence, RI, for Defendant.

## DECISION AND ORDER

TORRES, District Judge.

This is an action for declaratory and injunctive relief brought pursuant to 42 U.S.C. § 1983. The plaintiffs challenge a Rhode Island statute limiting the amount that an individual or entity may contribute to a political candidate during any calendar year. They allege that the statute violates their First Amendment rights to freedom of speech and association and that it denies non-incumbents seeking elected office equal protection of the laws in violation of the Fourteenth Amendment. After considering the evidence presented during a bench trial and for reasons stated below, I find that the plaintiffs have failed to establish that the statute is unconstitutional.

### Background Facts

In 1992, Rhode Island enacted the Rhode Island Campaign Contributions and Expenditures Reporting Act which made comprehensive changes in the laws regulating political campaign financing. 1992 R.I.Pub.Laws Ch. 21. Among other things, the Act revised the laws governing financial reporting requirements and limitations on campaign contributions and provided for matching public funds to candidates who agree to observe certain restrictions on campaign spending and related activities. The section of the Act now codified as R.I.Gen.Laws § 17-25 10.1(a)(1992) states:

> No person, other than the candidate ... shall make a contribution or contributions to any candidate ... which in the aggregate exceed One Thousand Dollars ($1,000) within a calendar year ...

*Id.*

Near the end of 1993, Rodney Driver, who was then a state representative, began seriously considering the possibility of running for the office of lieutenant governor in the election scheduled for November of 1994. Driver began raising money during the latter part of 1993, but did not formally announce his candidacy until early 1994, partly, because he wanted additional time in which to assess his chances of winning.

Shortly after Driver declared his candidacy, Harold Nomer, a friend and political supporter of Driver's, contributed $1,000 to Driver's campaign. A few weeks later, Nomer purchased a $50 ticket to a Driver fundraising event, but the money was returned to him because he already had contributed the maximum amount allowable under Section 17–25–10.1(a). Nomer testified that he was uncertain as to whether he would have made any further contributions to Driver's campaign.

Driver was defeated by the incumbent lieutenant governor in a Democratic primary and brought this action along with Nomer and the Rhode Island Political Action Committee for Education (RIPACE), which describes itself as a political action committee that makes campaign contributions to candidates who challenge incumbents. The plaintiffs allege that Section 17–25–10.1 violates their rights under the First and Fourteenth Amendments. Specifically, they contend that the statute's contribution limits and the fact that they are calculated on a calendar year basis rather than on an election cycle basis impermissibly infringes on their freedom of expression and association, and that it irrationally discriminates against challengers and their contributors by conferring a fundraising advantage on incumbents.

The evidence presented in support of and in opposition to those claims is rather scanty and consists, largely, of raw and, sometimes, incomplete statistical data or anecdotal evidence. To the extent pertinent, that evidence is summarized in the attached Supplemental Findings of Fact.

### Discussion and Conclusions of Law

#### I. Standard of Review:

The Supreme Court has recognized that regulation of elections, in general, necessarily burdens First and Fourteenth Amendment rights. On the other hand, the Court also has recognized that some regulation is necessary to insure the integrity of the electoral process and that subjecting all such regulations to "strict scrutiny" would unjustifiably "tie the hands of the states." *Burdick v. Takushi,* 504 U.S. 428, 433, 112 S.Ct. 2059, 2063, 119 L.Ed.2d 245 (1992); *See also*

*Anderson v. Celebrezze,* 460 U.S. 780, 788–89, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547 (1983). Accordingly, the Court has held that:

" ... the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights.... [W]hen those rights are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance'.... But when a state election law provision imposes only 'reasonable, non-discriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests' are generally sufficient to justify the restrictions."

*Burdick,* 504 U.S. at 434, 112 S.Ct. at 2063–64 (quoting *Anderson,* 460 U.S. at 788, 103 S.Ct. at 1569–70) (internal citation omitted).

█ Regulation that takes the form of limitations on political contributions also implicates First and Fourteenth Amendment rights. Such limitations may infringe on the rights of both candidates and their contributors to freedom of expression, freedom of association and equal protection. *See Buckley v. Valeo,* 424 U.S. 1, 22, 96 S.Ct. 612, 636, 46 L.Ed.2d 659 (1976) (per curiam); *Service Employees International v. Fair Political Practices Commission,* 955 F.2d 1312, 1316 (9th Cir.1992). Once again the test to be applied in determining whether such regulation passes Constitutional muster depends on the magnitude of the infringement, the importance of the state interest at stake and whether the regulation is discriminatory. *See Buckley,* 424 U.S. at 19–35; 96 S.Ct. at 635–42.

#### II. First Amendment Claim:

█ Limitations on the amounts that may be contributed to political campaigns have been held to have only a "marginal" impact on a *contributor's* freedom of expression because the expression involved is the symbolic act of contributing and it does not increase perceptibly with the size of the contribution. *Buckley,* 424 U.S. at 21, 96 S.Ct. at 635. It also has been held that such limitations do

not significantly impact a *candidate's* freedom of expression unless they prevent the candidate "from amassing the resources necessary for effective advocacy." *Buckley,* 424 U.S. at 21, 96 S.Ct. at 636. However, there are circumstances under which contribution limits may have a direct and substantial impact on a contributor's freedom of political *association.* In such cases, the limits are subjected to much closer scrutiny and the state is required to make a greater showing that they serve an important state interest. *Buckley,* 424 U.S. at 24–25, 96 S.Ct. at 637–38.

The contribution limit at issue in *Buckley* was very similar to the limit at issue in this case. The statute challenged in *Buckley* prohibited individuals from contributing more than $1,000 to any single candidate during an election "campaign." The Supreme Court upheld the statute noting that such limits promote a legitimate governmental purpose by reducing both corruption and the appearance of corruption that are created when large sums of money are raised from individual donors. *Buckley,* 424 U.S. at 25, 96 S.Ct. at 638. The Court found that the state's stake in achieving that goal outweighed any infringement on the rights of candidates and their contributors, saying:

> ... The weighty interests served by restricting the size of financial contributions to political candidates are sufficient to justify the limited effect upon First Amendment freedoms caused by the $1,000 contribution ceiling.

*Buckley,* 424 U.S. at 29, 96 S.Ct. at 640.

Rhode Island's contribution limit infringes on associational rights to a lesser extent than does the limit upheld in *Buckley* because Section 17–25–10.1(a) permits contributions of $1,000 to be made during each "calendar year" of an election campaign. Therefore, the question presented in this case is not whether Rhode Island's limit on the amount that individuals are allowed to contribute unreasonably restricts the plaintiffs' First Amendment rights. Rather, the question is whether calculating that limit on a calendar year basis impermissibly discriminates against challengers and their contributors.

## III. *Fourteenth Amendment Claim:*

 As already noted, if a statute limiting political contributions serves an important state interest, it is not rendered unconstitutional merely because it burdens First Amendment rights when the burden imposed is a relatively slight one. However, such a statute may be unconstitutional if the burden imposed falls more heavily on one group than another. In those cases, the regulation is subjected to stricter scrutiny that requires a showing that "the discrimination is itself necessary to achieve a substantial governmental interest." *Service Employees,* 955 F.2d at 1319; *See also Austin v. Michigan Chamber of Commerce,* 494 U.S. 652, 657, 110 S.Ct. 1391, 1396, 108 L.Ed.2d 652 (1990); *Federal Election Commission v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238, 256, 107 S.Ct. 616, 627, 93 L.Ed.2d 539 (1986). The more disproportionate the burden, the more likely it becomes that the statute will be held unconstitutional. *See Vote Choice, Inc. v. DiStefano,* 4 F.3d 26, 33 (1st Cir.1993).

In this case, the plaintiffs contend that the "calendar year cycle calculation" allows incumbents to raise more money during "off" years and that the $1,000 limit on contributions prevents challengers from "catching up" during election years.

### A. *Severability:*

 It is important to note at the outset that the provision establishing a "calendar year cycle calculation" is not severable from the provision establishing a $1,000 contribution limit. The statute contains no severability clause and there is no indication that the Rhode Island General Assembly intended that the $1,000 limit on contributions should be retained even if the provision requiring that it be calculated on an annual basis is invalidated. *See Service Employees,* 955 F.2d at 1321.

Moreover, it is clear that such selective pruning of the statute would markedly decrease the amount that the General Assembly has determined that an individual should be permitted to contribute to a candidate during the course of a campaign. It would amount to judicial rewriting of the statute, "a

practice that is decidedly disfavored." *Id.; See also Thornburgh v. American College of Obstetricians,* 476 U.S. 747, 764–65, 106 S.Ct. 2169, 2181, 90 L.Ed.2d 779 (1986).

Consequently, the issue confronting the Court is not whether changing the period used in calculating contribution limits from a calendar year to an election cycle would cure any perceived infirmity in Section 17–25–10.1(a). Rather, the issue is whether the statute, as written, passes Constitutional muster. To put it another way, the choice is between the present statute and no statute at all, and in making that choice, the pertinent inquiry is whether the provisions establishing contribution limits and calculating those limits on a calendar-year basis have the net effect of impermissibly discriminating against challengers.

### B. *Discriminatory Effect:*

Determining whether a statute imposing campaign contribution limits is discriminatory requires a two-step analysis. The reviewing court must:

1. Examine the language of the statute itself to determine whether it is even handed *on its face* and, if so

2. Ascertain whether "political realities" are such that *in practice* the statute has a discriminatory effect. *See,*

*Buckley,* 424 U.S. at 30–31 n. 33, 96 S.Ct. at 640 n. 33.

Clearly, Section 17–25–10.1 is not discriminatory on its face. It establishes the same contribution limits for all candidates without regard to whether they are incumbents or challengers. Therefore, the burden is on the plaintiffs to demonstrate that the statute has the practical effect of impermissibly discriminating against challengers as a group. In the words of the Supreme Court:

Absent record evidence of invidious discrimination against challengers as a class, a court should generally be hesitant to invalidate legislation which on its face imposes even handed restrictions.

*Buckley,* 424 U.S. at 31, 96 S.Ct. at 641.

### 1. *The Calendar Year Calculation:*

The plaintiffs claim that the "calendar year calculation" permits incumbents to collect more than $1,000 from an individual donor by receiving contributions during each year of an election cycle and that challengers, effectively, are limited to a single $1,000 election year contribution. Although that claim is plausible, it has not been proven.

The premise that challengers inherently are less able to attract "off year" contributions is predicated on the plaintiffs' assertion that political realities prevent challengers from declaring their candidacies until the election year. The evidence does not support that assertion. There is evidence that many challengers do not formally declare their candidacies until the election year. However, the evidence indicates that such timing generally reflects a voluntary choice based on tactical considerations rather than anything that impedes an earlier declaration. One of those tactical considerations is the desire to gauge the prospects of success by assessing the incumbent's popularity. Another is the desire to measure public sentiment with respect to potential issues before formulating positions on those issues. Such information customarily is obtained via opinion polls that are much more meaningful when taken during an election year. The choice of deferring a formal announcement also stems, in part, from the desire to avoid "peaking" too soon or exposing one's candidacy and one's position on the issues to public scrutiny for an extended period of time.

The statistical comparison is further skewed by the failure to take into account that some challengers declare late because they are not seriously committed to the race. In that connection, the evidence suggests that viable challengers who have a strong interest in running are likely to declare and/or have their campaigns well underway before election year.

By the same token, there is little evidence to support the premise that incumbents receive significant amounts from individual donors that exceed $1,000 or that any such amounts exceed similar contributions made to challengers. The statistics show, only, that during the 1993–94 election cycle, 23,000 "individuals" made contributions and 314 of them (i.e., 1.3%) gave the maximum of $1,000.

Because those figures do not differentiate between the years comprising the cycle, there is no way to determine how many different persons made the maximum contributions. Thus, the 314 "individuals" who "maxed out" might represent 314 different people, each of whom contributed $1,000 during one of the two years comprising the cycle. Alternatively, it might represent as few as 157 persons who gave $1,000 during both years of the cycle. Accordingly, there is no way of knowing whether any of those "individuals" contributed more than $1,000 to a given candidate during the election cycle. Even if it could be determined that some donors made multiple $1,000 contributions to a particular candidate, it would be impossible to tell how much of that money went to incumbents as opposed to challengers.

The data with respect to the remaining 22,686 "contributors" is even less informative. Once again the failure to differentiate between the years comprising the cycle makes it impossible to determine whether that figure represents as many as 22,686 different persons who contributed during only one year or as few as 11,343 persons who made contributions during both years of the cycle. Nor would it be possible to ascertain whether any multi year contributors donated an aggregate of more than $1,000.

In short, there is no evidence that the "calendar year calculation" results in incumbents receiving more than they would receive under an "election cycle calculation" or that it is responsible for incumbents receiving more from individual donors than challengers receive.

### 2. *The Limit on Contributions:*

█ The plaintiffs also claim that the $1,000 limit on contributions is discriminatory because, by limiting the amounts that can be raised from individual contributors during an election year, it prevents challengers from "catching up" with incumbents. That claim rests on the erroneous premise that, during an election year, challengers could raise more money from contributions in excess of $1,000 than incumbents could raise. In fact, the evidence establishes the opposite. It shows that incumbents are far more likely to attract large contributions and that, there-fore, contribution limits actually benefit challengers.

### Conclusion

The plaintiffs have failed to sustain their burden of proving that Section 17–25–10.1(a) unconstitutionally limits their first amendment rights or that it discriminates against challengers, as a class. Indeed, the fact that the success rate for challengers has risen from 20% to 34% since the statute was enacted, suggests that it may have had the opposite effect. Simply put, the evidence indicates that the net effect of R.I.Gen.Laws § 17–25–10.1 is to make the playing field more level for challengers although perhaps not as level as it could be.

For all of the foregoing reasons, it is hereby ORDERED that judgment be entered in favor of the defendants.

IT IS SO ORDERED,

### *SUPPLEMENTAL FINDINGS OF FACT*

1. In late 1993, Rodney Driver, who was then a state representative, began seriously considering the possibility of running for the office of Lieutenant Governor.

2. Driver began campaign activities during the latter part of 1993 but did not formally declare his candidacy until early 1994, partly, because he wanted additional time in which to assess his chances of winning.

4. Challengers frequently delay formally announcing their candidacies for a variety of reasons including the desire to first obtain the results of opinion polls measuring the incumbent's popularity and public sentiment on the issues as well as the desire to avoid "peaking" too soon.

5. Except for such tactical considerations, there are no reasons why challengers cannot declare prior to election year.

6. Shortly after Driver declared his candidacy, Harold Nomer, a friend and political supporter of Driver's, contributed $1,000 to Driver's campaign.

7. A few weeks later, Nomer purchased a $50 ticket to a Driver fund-raising event, but the money was returned to him because he

already had contributed the maximum amount allowable under R.I.Gen.Laws § 17–25–10.1(a).

8. Nomer is not sure whether he would have made any further contributions to Driver's campaign if allowed to do so.

9. Nomer was the only individual who made the maximum permissible contribution to Driver's campaign.

10. Apart from the additional $50 contribution by Nomer, there is no evidence that Driver could have raised more than $1,000 from any single individual.

11. During the election cycle preceding enactment of R.I.Gen.Laws § 17–25–10.1(a) incumbent general officers won 1 of the 5 races (i.e., 20%) in which they sought re-election.

12. Since the statute became effective (i.e., since 1992) incumbent general officers have won 4 of the 8 races (i.e., 50%) in which they sought re-election.

13. During each election cycle between 1989 and 1994, incumbent general office holders seeking re-election generally "received" more campaign money than any of their challengers.

14. Incumbents also "received" more campaign money than any of their challengers during the "off" years of those cycles.

15. During that time several challengers raised significant amounts of money during the off years.

16. Due to greater name recognition and other advantages of holding public office, incumbents, generally, are able to raise more money than are challengers.

17. Incumbents also are more likely than challengers to attract large contributions in excess of $1,000.

18. It is difficult to precisely measure the extent of any fund-raising advantage enjoyed by incumbents because the ranks of challengers may include less attractive or less committed candidates.

19. Some challengers are able to raise amounts comparable to their incumbent opponents.

20. Any fund-raising advantage enjoyed by incumbents is considerably diminished by campaign contribution limits and Rhode Island's system of providing matching funds for smaller contributions.

21. During the 1993–94 election cycle, 23,000 "individuals" made contributions to candidates for statewide office.

22. 314 of them (i.e., 1.3%) contributed the maximum of $1,000 during a calendar year.