# IN THE SUPREME COURT OF TEXAS

══════════
No. 20-0846
══════════

GREG ABBOTT, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF TEXAS;
AND RUTH HUGHS, IN HER OFFICIAL CAPACITY AS TEXAS SECRETARY OF STATE,
PETITIONERS,

v.

THE ANTI-DEFAMATION LEAGUE AUSTIN, SOUTHWEST, AND
TEXOMA REGIONS; COMMON CAUSE TEXAS; AND ROBERT KNETSCH,
RESPONDENTS

══════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS
══════════════════════════════

JUSTICE BLACKLOCK, concurring.

A balance must be struck between maximizing the options available to voters and guaranteeing the integrity of the vote. This case asks which branch of Texas government gets to strike that balance.

The most obvious answer, of course, is the Texas Legislature. *See* U.S. CONST. art. I, § 4 ("The Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof.").[1] In an ideal world, we would look no further

---

[1] *See also* TEX. CONST. art. VI, § 4 ("In all elections by the people, the vote shall be by ballot, and the Legislature shall provide for the numbering of tickets and make such other regulations as may be necessary to detect and punish fraud and preserve the purity of the ballot box; and the Legislature shall provide by law for the registration of all voters.").

than the Election Code. As recent events vividly demonstrate, however, we do not live in an ideal world. In response to the coronavirus, the Governor has asserted the authority, pursuant to Chapter 418 of the Government Code, to suspend provisions of the Election Code when, in his view, "strict compliance with the provisions . . . would in any way prevent, hinder, or delay necessary action in coping with [the virus.]"[2]

The validity of the Governor's asserted authority to temporarily alter election laws in response to the virus is not at issue here. Both sides in this case agree that the Governor can suspend election laws using his Chapter 418 authority. Neither side argues for a return to the rules dictated by the Legislature. Thus, the question before the Court is whether the Governor or a district court will decide how to balance the often-competing values of voter access and ballot integrity. The choice is binary. Either the balance will be struck by the Governor of the State acting pursuant to a legislative grant of authority, or it will be struck by a district court acting on the advice of plaintiffs who disagree with the Governor's judgment.

The correct answer is clear. Although the plaintiffs, their witnesses, and many observers may disagree with the Governor's decisions, they were not elected by the people of Texas and charged by statute with balancing competing policy goals during a pandemic. The judiciary is not empowered to second-guess the policy judgments of the other branches of government under the guise of constitutional law.

By affording little deference to the Governor's policy judgments and instead soliciting the opposing views of the plaintiffs' expert witnesses, the proceedings below improperly elevated

---

[2] The Governor of the State of Texas, Proclamation No. 41-3752, 45 Tex. Reg. 5449, 5457 (2020); *see also* TEX. GOV'T CODE § 418.016(a).

judicial "factfinding" above the democratic process. The People elect legislative and executive branch officials—not judges or "experts"—to make judgments about the costs and benefits of government action and to balance competing policy goals in light of those judgments.[3] If the Governor believes a slight pullback on his prior expansion of voters' options is necessary to ensure the integrity of the election, it makes no difference whether the plaintiffs' expert witnesses, the trial court, or the court of appeals disagree with him. The judicial branch's only role here is to require compliance with the Constitution, and not even the plaintiffs contend they have a constitutional right to hand-deliver a mail-in ballot to one of many drop-off locations in each county. "[J]udges do not possess special expertise or competence about how best to balance the costs and benefits of potential policy responses to the pandemic, including with respect to elections." *Dem. Nat'l Comm. v. Wis. State Leg.*, No. 20A66, 2020 WL 6275871, at *4 (U.S. Oct. 26, 2020) (Kavanaugh, J., concurring in denial of application to vacate stay). "When state and local officials 'undertake[] to act in areas fraught with medical and scientific uncertainties, their latitude must be especially broad.'" *Id.* (quoting *Andino v. Middleton*, No. 20A55, 2020 WL 5887393, at *1 (U.S. Oct. 5, 2020) (Kavanaugh, J. concurring in grant of application for stay)).

The plaintiffs contend that their constitutional rights have been "burdened." But again, they do not argue that the Texas Constitution requires the Governor to allow multiple mail-in ballot drop-off locations in each county prior to election day. Instead, they contend that the Governor's decision to limit drop-off locations—which still represents an overall expansion of voters' options relative to the rules established by the Legislature—must be subjected to a constitutional

---

[3] In Texas, of course, judges are also elected. But they are elected to exercise "the judicial power," TEX. CONST. art. V, § 1, which does not include the power to make policy for the State or to second-guess the policy choices of elected officials in the other branches.

"balancing test" derived from federal case law. *See generally Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992).[4] This balancing test, the plaintiffs contend, requires the trial court to take testimony and to find "facts," such as whether the fraud the Governor fears will actually come to pass, or whether the Governor's order will actually promote ballot integrity. The appellate court, presumably, would be expected to defer to the trial court's "factfindings" about whether the Governor's order will achieve its objectives or whether other courses of action would make more sense in a pandemic.

This is not how the judiciary should operate unless we are ready to throw in the towel on the separation of powers and accede to judicial supremacy. The "facts" at issue in this case are not typical adjudicative facts. They are not the "Who did what and when?" of this case. All agree on those facts. Instead, many of the "facts" at issue here involve predictive judgments about the consequences of various possible courses of government action. Such questions are "intractable to typical judicial processes of decisionmaking." *United States v. Windsor*, 570 U.S. 744, 815 n.7

---

[4] The plaintiffs' claims arise under the Texas Constitution. "In interpreting [the Texas] constitution, this state's courts should be neither unduly active nor deferential; rather, . . . Texas should borrow from well-reasoned and persuasive federal procedural and substantive precedent when this is deemed helpful, but should never feel compelled to parrot the federal judiciary." *Davenport v. Garcia*, 834 S.W.2d 4, 20 (Tex. 1992). Although this Court is under no obligation to apply federal case law to voting rights claims raised under the Texas Constitution, I do not object to the Court's doing so here because neither party argued otherwise. The parties no doubt felt compelled by this Court's precedent, which identifies a "right to vote" in Texas's equal protection clause, art. I, § 3, and applies federal voting-rights case law to voting-rights claims raised under the Texas Constitution. *See State v. Hodges*, 92 S.W.3d 489, 496, 501–02 (Tex. 2002). There is little need, however, to search for a right to vote in Texas's equal protection clause when our Constitution explicitly recognizes a right to vote: "Every person subject to none of the disqualifications provided by Section 1 of this article or by a law enacted under that section who is a citizen of the United States and who is a resident of this State shall be deemed a qualified voter." TEX. CONST. art. VI, § 2(a). Another provision of the Texas Constitution, which neither party raises, seems especially pertinent to this case: "In all elections by the people, the vote shall be by ballot, **and the Legislature shall . . . make such other regulations as may be necessary to detect and punish fraud and preserve the purity of the ballot box**." *Id*. § 4 (emphasis added). The Texas Constitution thus has plenty to say about voting rights, and I see little reason to default to federal judicial standards when resolving voting-rights claims raised under the state constitution. Perhaps future cases will afford the opportunity to apply the actual words of the Texas Constitution to voting-rights claims, instead of applying federal case law derived from federal constitutional text that does not appear in our state constitution.

(2013) (Alito, J., dissenting). Answering questions like these is the essence of policymaking, and—unless constitutional rights have been denied—it is the exclusive purview of the other branches of government, not the proper subject of courtroom factfinding. Only if strict scrutiny applies, under which courts presume government action invalid because it violates constitutional rights, do courts have any business subjecting the judgments of the other branches to an evidentiary trial.

Perhaps much of the blame lies with this Court's previous adoption of the *Anderson-Burdick* "flexible standard" for deciding voting-rights claims, borrowed from the U.S. Supreme Court. *Burdick*, 504 U.S. at 434. Such "balancing tests" often invite courts to engage in open-ended cost-benefit analysis with no objective guideposts, which is a quintessentially legislative way of making decisions. *See McDonald v. City of Chi.*, 561 U.S. 742, 795 (2010) (Scalia, J., concurring) ("The ability of omnidirectional guideposts to constrain is inversely proportional to their number."). Justice Scalia warned as much over three decades ago: "A government of laws means a government of rules," the antithesis of which is "the 'totality of the circumstances' mode of analysis" that characterizes tests like *Anderson-Burdick* balancing. *Morrison v. Olson*, 487 U.S. 654, 733 (1988) (dissenting opinion). A judge applying such a test can become indistinguishable from a policymaker, for nothing in the test "stop[s] [him] from arriving at any conclusion he sets out to reach." *McDonald*, 561 U.S. at 795 (Scalia, J., concurring).

The judiciary should strive to avoid casting itself in this role. Ours is only "[t]he *judicial* power of this State." TEX. CONST. art. II, § 1 (emphasis added). The executive and legislative powers belong to others. Those who disagree with the policy judgments of the other branches generally have their recourse in politics, not lawsuits.

I join the Court's opinion and respectfully concur.

 

 

 

_____

James D. Blacklock
Justice

**OPINION DELIVERED:** October 27, 2020